Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE

June 1, 2020

**2020 CO 45**

**No. 18SC445, *People v. Jones*—Statutory Interpretation—Sixth Amendment—Closure—Public Trial—Child Abuse—Person—Rule of Lenity—Structural Error.**

The supreme court holds that the trial court's exclusion of the defendant's parents during the testimony of two of his children constituted a partial closure of the courtroom. Further, because the trial court made no findings pursuant to *Waller v. Georgia*, 467 U.S. 39 (1984) before closing the courtroom, and a remand for additional findings cannot remedy that oversight, it violated the defendant's Sixth Amendment right to a public trial. And because that error was structural, Jones is entitled to a new trial.

The supreme court also concludes that it cannot discern the legislature's intent regarding a defendant's criminal liability under the child abuse statute for injury he caused to an unborn fetus who is later born alive with the consequences of that injury. Under the rule of lenity, the court therefore vacates the defendant's conviction for child abuse and concludes that he may not be retried on that charge.

# The Supreme Court of the State of Colorado
2 East 14th Avenue • Denver, Colorado 80203

## 2020 CO 45

### Supreme Court Case No. 18SC445
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 14CA1752

### Petitioner:

The People of the State of Colorado,

v.

### Respondent:

Andre Demetrius Willi Jones.

### Judgment Affirmed
*en banc*
June 1, 2020

**Attorneys for Petitioner:**
Philip J. Weiser, Attorney General
Erin K. Grundy, Assistant Attorney General
*Denver, Colorado*

**Attorneys for Respondent:**
Megan A. Ring, Public Defender
James S. Hardy, Lead Deputy Public Defender
*Denver, Colorado*

**JUSTICE HOOD** delivered the Opinion of the Court.
**JUSTICE BOATRIGHT** dissents, and **CHIEF JUSTICE COATS** and **JUSTICE SAMOUR** join in the dissent.

¶1 A jury concluded that Andre Jones shot and killed his estranged and pregnant wife. Although she died, medical personnel managed to deliver her severely injured baby. The jury found Jones guilty of many crimes related to the shooting, including first degree murder of his wife and child abuse resulting in serious bodily injury.

¶2 A division of the court of appeals reversed. First, it determined that the trial court erred by excluding Jones's parents from the courtroom during the testimony of two witnesses. The division therefore reversed the judgment of conviction and remanded the case for a new trial. Second, in a split decision, the division also held that Jones could not be retried for child abuse because an unborn fetus, even if later born alive, is not a "person" under the child abuse statute.

¶3 We affirm the division's decision on both issues, albeit on slightly different grounds as to the child abuse issue. First, the trial court's exclusion of Jones's parents constituted a partial closure of the courtroom that violated Jones's Sixth Amendment right to a public trial. Because that error was structural, Jones is entitled to a new trial. Second, we cannot discern the legislature's intent regarding a defendant's criminal liability under the child abuse statute for injury he caused to an unborn fetus who is later born alive. Under the rule of lenity, we therefore vacate Jones's conviction for child abuse and conclude that he may not be retried on that charge.

# I. Facts and Procedural History

¶4 The record at trial established the following facts.

¶5 Jones broke into his estranged wife's apartment while she was not home. He then lay in wait until she returned. As she attempted to unlock her front door, he fired a gun through the door, shooting her in the abdomen. She died shortly after reaching the hospital. At the time, she was about thirty weeks pregnant.

¶6 As a result of the mother's blood loss, the fetus was deprived of oxygen for an extended period of time. Although the baby survived, she was born with—and continues to endure—severe neurological deficits. The baby suffered a brain injury, which caused lack of muscle control. She is unable to breathe or swallow on her own. Therefore, she has a surgically implanted tube that allows her to eat, though its use requires frequent hospital visits. She also has vision and hearing loss.

¶7 The prosecution charged Jones with first degree murder (after deliberation), first degree murder (felony murder), unlawful termination of a pregnancy, child abuse resulting in serious bodily injury, second degree burglary, first degree trespass, possession of a defaced firearm, and two crime-of-violence counts. Jones's defense at trial was one of identity—he asserted that he was not the perpetrator. A jury convicted Jones as charged, and the court sentenced him to a cumulative term of life in prison.

¶8 Jones appealed. Among other things, Jones asserted that (1) the trial court violated his constitutional right to a public trial by excluding his parents from the courtroom during the testimony of his two children; and (2) he could not be tried for child abuse because the child abuse statute does not recognize an unborn fetus as a "person," even if the fetus is subsequently born alive.

¶9 A division of the court of appeals unanimously agreed with Jones that the trial court had violated his right to a public trial and that a new trial was warranted. *People v. Jones*, No. 14CA1752, ¶ 1 (Apr. 19, 2018). It therefore reversed the judgment of conviction, vacated Jones's sentences, and remanded the case for a new trial. *Id.*

¶10 The division was divided, however, on whether Jones could be retried for child abuse. The majority concluded that, under the child abuse statute, a fetus is not a "person." *Id.* at ¶ 45. Accordingly, the division held that on remand, Jones could only be tried "for the offenses of first degree murder after deliberation, second degree burglary, and possession of a defaced firearm." *Id.* at ¶ 82. In his dissent, Judge Webb concluded that the prosecution should be able to retry Jones for child abuse, primarily based on the common law "born alive" doctrine, *id.* at ¶ 83, which we discuss in greater detail below.

¶11    We granted the prosecution's petition for certiorari review.[1]

## II. Analysis

¶12    We first address a defendant's constitutional right to a public trial. We examine what constitutes a closure of the courtroom implicating that right. Based on the circumstances presented here, we conclude that there was a partial closure that violated Jones's right to a public trial. Because this constituted structural error, Jones is entitled to a new trial.

¶13    We also interpret the term "person" as it is used in the child abuse statute. After using various tools of statutory construction and failing to ascertain the General Assembly's intent, we resort to the rule of lenity and conclude that the term "person," as used in the child abuse statute, does not include an unborn fetus. Accordingly, on remand, Jones may not be retried for that charge.

---

[1] We granted certiorari to review the following issues:

1. Whether the exclusion of the defendant's parents for cause during the testimony of the defendant's [children] constitutes a "closure" for purposes of the Sixth Amendment when the courtroom remained open to the general public during the entire trial.

2. Whether the court of appeals erred by interpreting the child abuse statute to preclude a conviction for child abuse where the child suffered injuries in utero but was then born alive, contrary to another division's holding in *People v. Lage*, 232 P.3d 138 (Colo. App. 2009), and inconsistent with the post *Lage* amendments to the child abuse statute.

## A. Sixth Amendment Right to a Public Trial

### 1. Standard of Review

¶14 We review a trial court's decision to close the courtroom as a mixed question of law and fact. *People v. Hassen*, 2015 CO 49, ¶ 5, 351 P.3d 418, 420. Thus, "we accept the trial court's findings of fact absent an abuse of discretion, but we review the court's legal conclusions de novo." *Id.* (quoting *Pena-Rodriguez v. People*, 2015 CO 31, ¶ 8, 350 P.3d 287, 289, *rev'd on other grounds*, 137 S. Ct. 855 (2017)).

### 2. The Right to a Public Trial Generally

¶15 "Both the United States and the Colorado Constitutions guarantee criminal defendants the right to a public trial." *Id.* at ¶ 7, 351 P.3d at 420; *see* U.S. Const. amends. VI, XIV; Colo. Const. art. II, § 16.

¶16 This right "is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions." *Waller v. Georgia*, 467 U.S. 39, 46 (1984) (quoting *Gannett Co. v. DePasquale*, 443 U.S. 368, 380 (1979)). Courts specifically recognize the important role a defendant's family members play in reminding the trial participants of this duty. *See, e.g.*, *In re Oliver*, 333 U.S. 257, 272 (1948); *United States v. Rivera*, 682 F.3d 1223, 1230 (9th Cir. 2012).

6

¶17 Further, "[i]n addition to ensuring that [the] judge and prosecutor carry out their duties responsibly, a public trial encourages witnesses to come forward and discourages perjury." *Waller*, 467 U.S. at 46; *see Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 606 (1982) ("Public scrutiny of a criminal trial enhances the quality and safeguards the integrity of the factfinding process . . . . [P]ublic access to criminal trials permits the public to participate in and serve as a check upon the judicial process—an essential component in our structure of self-government.").

¶18 A public trial also protects the public's and the press's qualified First Amendment rights to attend a criminal trial. *Waller*, 467 U.S. at 44; *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580 (1980). "While innocent defendants benefit from the potential advantages of public trials . . . a guilty defendant may prefer secret proceedings where bribes, intimidation, or unfavorable verdicts can pass without 'the bracing sunshine of publicity.' Society, however, has an interest in fair outcomes in both situations." Kristin Saetveit, *Close Calls: Defining Courtroom Closures Under the Sixth Amendment*, 68 Stan. L. Rev. 897, 903 (2016) (citations omitted) (quoting Akhil Reed Amar, *Sixth Amendment First Principles*, 84 Geo. L.J. 641, 677 (1996); *see Richmond Newspapers*, 448 U.S. at 571 ("[T]he open processes of justice serve an important prophylactic purpose, providing an outlet for community concern, hostility, and emotion.").

¶19 Armed with these noble sentiments, we must now figure out how to deploy them. First, what does it mean to have a "public" trial? Of course, in the most general sense, the term defines itself: A "public" trial is one that is not secret; it is one that the public is free to attend. *Hampton v. People*, 465 P.2d 394, 399 (Colo. 1970).

¶20 But this broad definition has limitations. Given competing interests, a criminal defendant's right to a public trial is not absolute. At times, it must yield to concerns such as "the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." *Waller*, 467 U.S. at 45; *accord Hassen*, ¶ 8, 351 P.3d at 421. Thus, while the total exclusion of the press and the public generally amounts to a closure, such closures may be permissible under certain circumstances.

¶21 Recently, we noted that these circumstances "will be rare" and "the balance of interests must be struck with special care." *Hassen*, ¶ 8, 351 P.3d at 421 (quoting *Waller*, 467 U.S. at 45). To justify a closure, (1) "the party seeking to close the [proceeding] must advance an overriding interest that is likely to be prejudiced"; (2) "the closure must be no broader than necessary to protect that interest"; (3) "the trial court must consider reasonable alternatives to closing the proceeding"; and (4) the "trial court must make findings adequate to support the closure." *Id.* at ¶ 9, 351 P.3d at 421 (quoting *Waller*, 467 U.S. at 48). Regarding the third factor, we

recently emphasized that the Supreme Court insists that "[t]rial courts are obligated to take *every reasonable measure* to accommodate public attendance at criminal trials." *Id.* (quoting *Presley v. Georgia*, 558 U.S. 209, 215 (2010)).

### 3. "Partial Closure" of a Courtroom

¶22 But what if the closure is less complete? What if only one or two people are excluded from the trial? Or, as happened here, what if two people (specifically, a defendant's parents) are excluded but only during the testimony of two witnesses? Are these closures that must first be justified by a *Waller* analysis? These questions have been hotly debated.

¶23 Many courts recognize that the exclusion of even a single individual can, under certain circumstances, implicate the values the Sixth Amendment seeks to protect. For example, the Ninth Circuit has observed that, "because they are the individuals most likely to be affected by the" outcome of a proceeding, "[f]riends and family members . . . are particularly effective" at reminding "the [trial] participants, especially the judge, that the consequences of their actions extend to the broader community." *Rivera*, 682 F.3d at 1230. Thus, many courts now recognize limited exclusions as partial closures, though there remains some disagreement regarding what findings are required for such closures.

¶24 Some courts apply a more lenient "substantial reason" test to justify partial closures, reasoning that "the partial closing of court proceedings does not raise the

9

same constitutional concerns as a total closure, because an audience remains to ensure the fairness of the proceedings." *United States v. Osborne*, 68 F.3d 94, 98–99 (5th Cir. 1995); *accord United States v. Simmons*, 797 F.3d 409, 414 (6th Cir. 2015); *Judd v. Haley*, 250 F.3d 1308, 1315 (11th Cir. 2001). Under this modified *Waller* test, courts generally replace *Waller*'s "overriding interest" factor with the less stringent "substantial reason" factor, but otherwise employ the full *Waller* analysis. *See Simmons*, 797 F.3d at 414; *Woods v. Kuhlmann*, 977 F.2d 74, 76–77 (2d Cir. 1992); *see also United States v. Addison*, 708 F.3d 1181, 1187–88 (10th Cir. 2013); *Davis v. Reynolds,* 890 F.2d 1105, 1109–10 (10th Cir. 1989).

¶25 Other courts require the full *Waller* analysis for partial closures. After all, they say, the *Waller* test "already contemplates a balancing of competing interests"—such as reasonable alternatives to closure and the scope of the closure itself. *People v. Jones*, 750 N.E.2d 524, 529 (N.Y. 2001). So there is no need to distinguish between partial and total closures. *Id.* (concluding that because a partial closure implicates the same Sixth Amendment rights as a total closure, *Waller*'s overriding interest requirement must still be met); *see also, e.g., Tinsley v. United States*, 868 A.2d 867, 874 (D.C. 2005) ("[W]e are not persuaded that the distinction between a 'substantial reason' and an 'overriding interest' is a particularly meaningful one."); *State v. Mahkuk*, 736 N.W.2d 675, 685 (Minn. 2007) ("Although some federal circuit courts of appeals apply a lesser 'substantial

reason' test to review the constitutionality of partial closures, we have not . . . ." (citation omitted)).

¶26 While courts debate what test to use, it seems that most courts now recognize that partial closures can have constitutional significance. *See* Saetveit, *supra,* at 917–19 (collecting cases that recognize partial closures from nearly every federal circuit court as well as New York, Illinois, Minnesota, Alabama, South Dakota, and New Mexico); *see also, e.g., State v. Barnes*, 251 P.3d 96, 99, 100–01 (Kan. Ct. App. 2011); *Longus v. State*, 7 A.3d 64, 67–68, 75–76 (Md. 2010); *Commonwealth v. Cohen*, 921 N.E.2d 906, 920–22 (Mass. 2010); *State v. Torres*, 844 A.2d 155, 160–61 (R.I. 2004); *Woods v. State*, 383 S.W.3d 775, 781 (Tex. App. 2012).

¶27 We join these courts in recognizing the potential constitutional significance of partial closures, but we save for another day the decision regarding whether the first *Waller* factor requires a "substantial reason" or an "overriding interest" in this context. Regardless, we conclude that before granting a partial closure request, the trial court must consider the *Waller* factors.[2]

---

[2] Despite this debate about how to address partial closures, courts still generally agree that there are certain situations where the exclusion of specific individuals does not constitute a closure that would implicate a defendant's right to a public trial.

For example, it is well-accepted that sequestration orders do not implicate this right. *See, e.g.*, CRE 615; *People v. Watkins*, 553 P.2d 819, 821 (Colo. 1976)

11

## 4. Whether an Unconstitutional Partial Closure Occurred Here

¶28    With this precedent in mind, the initial question we confront is whether, under the circumstances here, the trial court's exclusion of Jones's parents during the testimony of his two children amounted to a closure requiring a *Waller* analysis. If we conclude that this was a closure, we must then decide whether the lack of *Waller* findings can be cured by a remand for additional findings or whether the violation requires a new trial.

¶29    Here, the prosecution requested the exclusion of Jones's mother and stepfather during the testimony of Jones's two children (A.J. and J.J.) based on

---

(acknowledging that regulating the sequestration of witnesses is a matter of discretion); *Williamson v. Sch. Dist. No. 2*, 695 P.2d 1173, 1175 (Colo. App. 1984) ("[A]bsent the exceptions not pertinent here, sequestration is a matter of right for either litigant."); *see also* 23 C.J.S. *Criminal Procedure and Rights of Accused* § 930 (updated 2020) ("The right to a public trial is not implicated by the exclusion of a potential witness pursuant to the witness exclusionary or sequestration rule.").

Nor does in camera voir dire of jurors implicate the right. *See People v. Dunlap*, 975 P.2d 723, 757–58 (Colo. 1999) (discussing the use of in camera voir dire to question jurors individually about their views on the death penalty); *People v. Rudnick*, 878 P.2d 16, 21 (Colo. App. 1993) (acknowledging the use of in camera discussions with individual prospective jurors as a component of the voir dire process); *see also Richmond Newspapers*, 448 U.S. at 598 n.23 (Brennan, J., concurring in the judgment) (concluding that conferences held in chambers or at the bench do not necessarily implicate the Sixth Amendment); *United States v. Bansal*, 663 F.3d 634, 661 (3d Cir. 2011) (holding that closed, in camera voir dire of individual jurors on sensitive subjects did not "offend the Sixth Amendment").

Our opinion today should not be construed to suggest otherwise.

events that had occurred outside the courtroom the previous weekend. According to the prosecutor, as A.J. and J.J. left their paternal grandparents' home, their grandmother, Jones's mother, hugged A.J., "started bawling uncontrollably and said, I'm sorry you are going to have a tough week." This then "sent A.J. into a bit of a tailspin" and "[set] him very much on edge." Thus, the prosecutor asked for Jones's parents to be excluded from the courtroom while the children testified, "for the benefit of the children. . . . [Because the grandparents] have already put the children on edge about a difficult situation they are in as it is. And I don't want to put them in harm's way any further than we have to."[3]

¶30     In granting the request, the court made no findings to support its decision. The court simply said that, "given the circumstances, I'm going to order that neither [of Jones's parents] are going to be allowed in the courtroom during the children's testimony." Defense counsel objected based on Jones's right to a public trial and asked that at least Jones's stepfather be allowed to remain since he "[did]

---

[3] The prosecutor claimed that "all parties [in the related dependency and neglect proceeding] were asked to not speak to the kids about any of the court proceedings or do anything that might make them more on edge regarding court proceedings." If there was a court order to this effect, it is not part of the record in this case. Moreover, the trial court made no finding that anyone had violated a court order. In the absence of such a finding, there is simply no basis to conclude that Jones's mother violated a court order by getting upset and expressing her concern that one of the children was going to have a hard week.

not have any involvement with this situation." The court summarily denied the request.

¶31 The prosecution contends that this was merely an exclusion for cause, not a closure. As such, they say it was within the court's discretion to exclude Jones's parents to maintain courtroom decorum without implicating the Sixth Amendment. The prosecution cites to *State v. Lormor*, 257 P.3d 624, 628–29 (Wash. 2011), to support its argument that exclusion of only one or two people, "without more, is simply not a closure."

¶32 In *Lormor*, the defendant's daughter, who was not quite four years old, was confined to a wheelchair and on a ventilator. *Id.* at 626. In deciding to exclude the daughter from the proceedings, the court noted that, given the girl's young age, "I don't know how much she would understand of the proceedings[, and], given the setup I could even hear at the bench the ventilator operating." *Id.* The court then concluded that having the daughter present "would be an inappropriate distraction and frankly [as] difficult for her as it would be potentially distracting for the jury." *Id.*

¶33 On appeal, the Washington Supreme Court concluded that this exclusion did not amount to a closure because only a single person was excluded from the courtroom. *Id.* at 628–29. It therefore implicitly rejected the notion of a "partial" closure. The court then concluded that, as a matter of maintaining courtroom

14

decorum, the trial court had not abused its discretion in excluding the defendant's daughter for several reasons: the defendant's entire family wasn't excluded; the doors were not locked; the proceedings were not held in a location closed to the public (e.g., the judge's chambers); and the defendant was not excluded from the proceedings. *Id.* at 628. In affirming the trial court's decision, the supreme court further observed that the distraction was observable in the courtroom, the defendant made no objection, and "[t]he trial court judge discussed the removal on the record and gave his reasons for doing so." *Id.* at 626–27, 630.

¶34 But the prosecution's reliance on *Lormor* seems misplaced for at least two reasons. First, by joining what seems to be the majority of jurisdictions in recognizing the constitutional significance of partial closures, we accept that the exclusion of even a single person, depending on the circumstances, can violate a defendant's public trial right. Thus, on this point, we simply disagree with *Lormor*.

¶35 Second, unlike in *Lormor*, here there was no disruption in the courtroom. Moreover, even accepting the prosecution's offer of proof as to what had happened the preceding weekend between Jones's mother and his children, the court made no findings—under *Waller* or otherwise—as to why this provided cause to exclude both parents. There was no showing that Jones's stepfather or the child J.J. were involved in, or affected by, the out-of-court incident. Thus, at least as to J.J.'s testimony and Jones's stepfather's presence, there was no record

15

made showing any cause for exclusion. Even as to Jones's mother, there is little to nothing in the record to support the conclusion that her presence at trial would have created the potential for disruption or witness intimidation.

¶36 Therefore, we conclude the trial court's exclusion of Jones's parents from the courtroom without first making any *Waller* findings constituted an unjustified partial closure.[4]

¶37 The prosecution further contends, however, that even if the court's exclusion of Jones's parents was a closure, it was trivial. In a recent opinion, we adopted the triviality exception. *See People v. Lujan*, 2020 CO 26, ¶ 23, 461 P.3d 494,

---

[4] As noted, we distinguish the situation here from those situations where the trial court must address a disturbance in the courtroom. Some courts treat the exclusion of individuals who have caused, or are causing, a disruption as a matter within the court's discretion to maintain order that does not implicate the Sixth Amendment. *See, e.g.*, *McCrae v. State*, 908 So. 2d 1095, 1096 (Fla. Dist. Ct. App. 2005) (concluding the Sixth Amendment was not implicated, and a *Waller* analysis was not necessary, where the court imposed "time and manner restrictions on ingress and egress" because "[d]isruption may interfere with a spectator's attention, or a participant's performance, at public events of many kinds"). Other courts treat such exclusions as Sixth Amendment closures that must first be justified under the *Waller* test. *See, e.g.*, *Cosentino v. Kelly*, 926 F. Supp. 391, 395 (S.D.N.Y. 1996) (recognizing that "[t]he right to a public trial has always been interpreted as being subject to the trial judge's power to keep order in the courtroom," but nonetheless analyzing a partial closure based on disruptive behaviors under *Waller* (quoting *United States v. Hernandez*, 608 F.2d 741, 747 (9th Cir. 1979))), *aff'd*, 102 F.3d 71 (2d Cir. 1996). On the facts before us, we need not join this debate today.

499. A "trivial closure" is one where, although the closure might have been unjustified, it was "'so trivial as not to violate' a defendant's right to a public trial." *Id.* at ¶ 17, 461 P.3d at 498 (quoting *Peterson v. Williams*, 85 F.3d 39, 40 (2d Cir. 1996)).

¶38 In assessing triviality, courts consider "whether the actions of the court and the effect that they had on the conduct of the trial deprived the defendant . . . of the protections conferred by the Sixth Amendment." *Peterson*, 85 F.3d at 42. To do so, they look to the "values furthered by the public trial guarantee"; namely, "1) to ensure a fair trial; 2) to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions; 3) to encourage witnesses to come forward; and 4) to discourage perjury." *Id.* at 43. A court should consider the totality of the circumstances and consider factors such as "the duration of the closure, the substance of the proceedings that occurred during the closure, whether the proceedings were later memorialized in open court or placed on the record, whether the closure was intentional, and whether the closure was total or partial." *Lujan*, ¶ 19, 461 P.3d at 498–99.

¶39 Courts sometimes find that closures that are brief and inadvertent are so trivial as to not violate the defendant's right to a public trial because they did not infringe on the values protected by the right. *See United States v. Ivester*, 316 F.3d 955, 960 (9th Cir. 2003) (holding that a brief, mid-trial closure to question jurors

17

about their expressed concerns regarding safety was trivial); *Peterson*, 85 F.3d at 44 (holding that "in the context of this case, where the closure was 1) extremely short, 2) followed by a helpful summation, and 3) entirely inadvertent, the defendant's Sixth Amendment rights were not breached"); *United States v. Al-Smadi,* 15 F.3d 153, 154–55 (10th Cir. 1994) (holding that a closure that was not ordered by the trial court but rather was the result of standard courthouse practices, was "brief and inadvertent," "unnoticed by any of the trial participants," and occurred only once did not violate the Sixth Amendment); *see also Lujan*, ¶¶ 26–36, 461 P.3d at 500–02 (holding that although closure was deliberate, it was trivial for several reasons: it was brief; it was transcribed by the recorder; it repeated information that had been presented in open court; and it did not involve the presentation of evidence, witness testimony, or any novel legal issues).

¶40 However, intentional closures during more significant, and less fleeting, testimony are generally considered not trivial because of their potential to affect the fairness of the proceedings. *See Hassen*, ¶ 16, 351 P.3d at 422 (concluding that a closure during two witnesses' testimony that spanned twenty-seven pages of transcript was not trivial); *see also Gonzalez v. Quinones*, 211 F.3d 735, 737–38 (2d Cir. 2000) (concluding that an intentional closure, during a key witness's testimony, that lasted an entire morning was not trivial); *State v. Ndina*, 761 N.W.2d 612, 627–28 (Wis. 2009) (concluding that the exclusion of most of the defendant's

18

family for three days of witness testimony was not trivial). *But compare Rivera*, 682 F.3d at 1230 (concluding that exclusion of the defendant's seven-year-old son and other family members from the sentencing hearing was not trivial), *with United States v. Perry*, 479 F.3d 885, 890–91 (D.C. Cir. 2007) (concluding that the exclusion of the defendant's eight-year-old son for the entirety of trial was trivial).

¶41 We conclude that the exclusion here was not trivial for at least two reasons. First, as previously noted, in evaluating a defendant's right to a public trial, courts emphasize the important role the presence of a defendant's family plays in ensuring a fair trial. *See, e.g.*, *In re Oliver*, 333 U.S. at 272 ("[A]n accused is at the very least entitled to have his friends, relatives and counsel present, no matter with what offense he may be charged."); *English v. Artuz*, 164 F.3d 105, 108 (2d Cir. 1998) ("[T]he Supreme Court has specifically noted a special concern for assuring the attendance of family members of the accused." (quoting *Vidal v. Williams,* 31 F.3d 67, 69 (2d Cir. 1994))). Jones's parents' absence during his children's testimony implicated the public trial right guarantees because their presence could have discouraged perjury. Further, numerous courts have concluded that the presence of a defendant's family at trial reminds the trial participants of their duty to treat the defendant fairly. *See, e.g.*, *Rivera*, 682 F.3d at 1230; *Longus*, 7 A.3d at 75 ("[T]he defendant's family and friends are the people who have the strongest interest or concern in the handling of the defendant's trial and their attendance perhaps best

19

serves the purpose of the Sixth Amendment guarantee."). This is all the more important when a defendant is charged with an unusually vicious offense of the sort likely to arouse passion and a widespread desire for vengeance.

¶42 Second, the testimony at issue was significant, and the partial closure here was not brief. The two witnesses—Jones's children—provided insight into Jones's relationship with the children's mother around the time she was killed. They also identified Jones's gun. Moreover, their testimony was hardly fleeting. It resulted in 146 pages of transcript, almost an entire afternoon during a ten-day trial.

¶43 Therefore, we conclude that the exclusion of Jones's parents during his children's testimony violated his right to a public trial, despite the fact that other members of the public were able to attend.

### 5. The Remedy for Violating Jones's Right to a Public Trial

¶44 In light of this violation, we must now determine the appropriate remedy.

¶45 Certain types of errors are structural, meaning that they affect the basic framework within which the trial occurs and are not merely errors in the trial process. *Hassen*, ¶ 7, 351 P.3d at 420. These errors "are not amenable to either a harmless error or a plain error analysis." *Id.* (quoting *Griego v. People*, 19 P.3d 1, 7 (Colo. 2001)). Therefore, they "require automatic reversal without individualized analysis of how the error impairs the reliability of the judgment of conviction." *Hagos v. People*, 2012 CO 63, ¶ 10, 288 P.3d 116, 119. Examples include the

20

"complete deprivation of counsel, trial before a biased judge, unlawful exclusion of members of the defendant's race from a grand jury, denial of the right to self-representation, and *denial of the right to a public trial*." *Id.* (emphasis added). Nonetheless, some courts have chosen to remand cases where the trial court violated the defendant's right to a public trial to allow the trial court to make the required findings. *See Waller*, 467 U.S. at 49–50; *United States v. Galloway*, 937 F.2d 542, 547 (10th Cir. 1991).

¶46 We conclude that such a remand would not be helpful here. First, the trial judge, unfortunately, has died; therefore, it is not possible to remand for more detailed findings about his reasoning at the time he closed the courtroom. Second, while the prosecution has suggested that a remand to incorporate information from a contemporaneous and related dependency and neglect case could support the closure, any information from the dependency and neglect case would be insufficient to satisfy the second, third, and fourth *Waller* factors.

¶47 A quick review of the *Waller* factors makes this more plain. As to the first factor — advancing an overriding interest or substantial reason for the closure — we assume, without deciding, that under either the overriding interest or the substantial reason test, this factor is satisfied.

¶48 As to the second factor — whether the closure was no broader than necessary — we believe a remand would constitute an exercise in futility. As noted

21

above, defense counsel asked that Jones's stepfather be allowed to attend, but the court summarily denied the request. Whether it actually considered this option is unclear. What is clear is that there was no discussion about whether either or both of Jones's parents could be present during J.J.'s testimony or whether J.J. had observed and been similarly influenced by Jones's mother's conduct over the weekend. Thus, we conclude that a remand would fail to satisfy this factor because these options were not explored contemporaneously.

¶49 As to the third factor—whether the court considered any alternatives to closing—here too, a remand would not help. It does not appear that the court considered any alternatives to partially closing the courtroom, such as allowing the children to testify in camera or having Jones's parents observe the testimony on a closed-circuit television. A remand cannot change that.

¶50 As to the fourth factor—adequate findings by the trial court—we're similarly stuck. Because the judge is now deceased, no such findings are possible. And even if findings by another judge based on records from the dependency and neglect case and other reconstruction methods were an option, supplemental findings would still fail to adequately address the second and third factors, as explained above.

¶51 Therefore, because the trial court violated Jones's right to a public trial by excluding Jones's parents from the proceedings without first justifying that

22

decision under *Waller*, and because such a violation constitutes structural error that cannot be cured by a remand in this instance, we reverse Jones's convictions and remand the case for a new trial.

¶52 While this remedy will no doubt strike some as draconian, on these facts, fidelity to the law regarding public trials and structural error compels the remedy all the same.

## B. Definition of "Person" In the Child Abuse Statute

¶53 Because the issue will arise on remand, we must address the second question on which we granted certiorari; namely, whether the court of appeals erred by interpreting the child abuse statute to preclude a conviction for child abuse where the fetus suffered injuries but is then born alive.

¶54 Statutory interpretation presents a question of law that we review de novo. *McCoy v. People*, 2019 CO 44, ¶ 37, 442 P.3d 379, 389. In interpreting statutes, our primary goal is to discern the legislature's intent. *Id.* We do so by first looking to the plain language of the statute, reading the statute as a whole and giving words and phrases their common meanings. *Id.* If the language is clear, we apply it as written. *Id.*

¶55 If, however, the language is ambiguous, meaning it is silent or susceptible to more than one reasonable interpretation, we may use extrinsic aids of construction, "such as the consequences of a given construction, the end to be

achieved by the statute, and the statute's legislative history." *Id.* at ¶ 38, 442 P.3d at 389; *see Martinez v. People*, 2020 CO 3, ¶ 17, 455 P.3d 752, 756; *People v. Carrillo*, 2013 COA 3, ¶¶ 12–13, 297 P.3d 1028, 1030.

¶56 The child abuse statute provides that "[a] person commits child abuse if such person causes an injury to a child's life or health, or permits a child to be unreasonably placed in a situation that poses a threat of injury to the child's life or health." § 18-6-401(1)(a), C.R.S. (2019). It also defines "child" as "a person under the age of sixteen years." § 18-6-401(2). The statute does not define "person."

¶57 The legislature's general definitions, which "apply to every statute, unless the context otherwise requires," § 2-4-401, C.R.S. (2019), define person as "any individual, corporation, government or governmental subdivision or agency, business trust, estate, trust, limited liability company, partnership, association, or other legal entity," § 2-4-401(8). This definition does not aid our interpretation of the term "person" as it is used in the child abuse statute. And the common definitions of the term "person" are also not dispositive in this context. *See Person*, Black's Law Dictionary (11th ed. 2019) ("A human being."); Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/*person* [https://perma.cc/8ZAZ-9NY2] (defining "person" as "Human, Individual").

¶58 Thus, because the child abuse statute is silent as to whether an unborn fetus is a "child," and because the plain language does not reveal a clear legislative

24

intent regarding this term, we conclude that the statute is ambiguous. We therefore turn to other aids of construction.

¶59     One of the aids we may employ is to look to other statutes where the legislature has defined the term at issue, particularly when those statutes should be read in pari materia. *Walgreen Co. v. Charnes*, 819 P.2d 1039, 1043 n.6 (Colo. 1991) ("*In pari materia* is a rule of statutory construction which requires that statutes relating to the same subject matter be construed together in order to gather the legislature's intent from the whole of the enactments."). Using this tool, Jones urges us to consider the definitions in the homicide and unlawful termination of pregnancy statutes, both of which exclude an unborn fetus from the definition of person. *See* § 18-3-101(2), C.R.S. (2019) ("'Person', when referring to the victim of a homicide, means a human being who had been born and was alive at the time of the homicidal act."); § 18-3.5-110, C.R.S. (2019) ("Nothing in this article shall be construed to confer the status of 'person' upon a human embryo, fetus, or unborn child at any stage of development prior to live birth."). The prosecution contends, however, that the definitions contained in those statutes have no application to our interpretation of "person" in the child abuse statute.

¶60     We agree with the prosecution that those exclusionary definitions do not clarify the legislative intent in the child abuse context. First, we do not read these statutes in pari materia. They cover different subjects and different harms

25

—causing death (to either an unborn fetus or a living child) versus protecting a child who is still alive. The legislature clearly intended for the homicide statute to apply only to those individuals "who had been born and [were] alive at the time of the homicidal act." § 18-3-101(2). We cannot infer from this definition, however, that the child abuse statute similarly applies only to harm caused to those who are already born at the time of the injurious conduct. *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 174 (2009) ("When conducting statutory interpretation, we 'must be careful not to apply rules applicable under one statute to a different statute without careful and critical examination.'" (quoting *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 393 (2008))). Without a cross-reference or specific incorporation, we will not infer a legislative intent to apply the homicide definition in the child abuse context. *See People v. Thornton*, 929 P.2d 729, 733–34 (Colo. 1996) (refusing to incorporate definitions from one statutory title into another title where such application was not expressly provided for by the legislature).

¶61 Likewise, the unlawful termination of pregnancy statute expresses a clear intent to protect *a mother* who has had a pregnancy terminated through the injurious conduct of another: "A person commits the offense of unlawful termination of pregnancy in the first degree if, with the intent to terminate unlawfully the pregnancy of a woman, the person unlawfully terminates the woman's pregnancy." § 18-3.5-103(1); *see* § 18-3.5-101(6), C.R.S. (2019) ("'Unlawful

26

termination of pregnancy' means the termination of a pregnancy by any means other than birth or a medical procedure . . . for which the consent of the pregnant woman . . . has been obtained . . . .").  It does not address harm to fetuses, and it does not discuss children.  Thus, as with the homicide statute, because the unlawful termination of pregnancy statute and the child abuse statute cover different harms, and because neither expressly cross-references or incorporates the other, we will not infer a legislative intent to apply the unlawful termination of pregnancy definition of "person" in the child abuse context.

¶62    Second, Jones contends that the legislative history, including several failed voter initiatives, support the conclusion that the legislature did not intend to permit recovery for injuries caused to a fetus under the child abuse statute. However, we will not interpret failed voter initiatives as proof of legislative intent.

¶63    Similarly, we decline the prosecution's invitation to infer legislative intent from the fact that the legislature has not amended the definition of "child" or "person" in the child abuse statute following *People v. Lage*, 232 P.3d 138 (Colo. App. 2009), despite amending the statute several times. *See Welby Gardens v. Adams Cty. Bd. of Equalization*, 71 P.3d 992, 998 n.8 (Colo. 2003) ("[W]e note that of the many sources we may consult to discern legislative intent, reliance on legislative inaction is particularly risky.  The reasons for enacting, or not enacting, legislation are too numerous to tally."); *Williams v. Dep't of Pub. Safety*, 2015 COA 180, ¶ 103,

27

369 P.3d 760, 778 (refusing to interpret the legislature's failure to amend a statute following a decision interpreting it, despite amending other sections of the statute, as indicative of legislative intent).

¶64 In *Lage*, a division of the court of appeals held that the term "person," as used in the child abuse statute, "include[s] a fetus who is injured while in the womb, is subsequently born and lived outside the womb, and then died from the injuries sustained." 232 P.3d at 144. The division reached this conclusion based on other jurisdictions' application of the common law "born alive" doctrine in criminal contexts and on this court's application of the doctrine in the civil context of interpreting Colorado's wrongful death statute. *Id.* at 143–44.

¶65 However, "[i]t is 'impossible to assert with any degree of assurance that [legislative] failure to act represents' affirmative [legislative] approval of the Court's statutory interpretation." *Patterson v. McLean Credit Union,* 491 U.S. 164, 175 n.1 (1989) (quoting *Johnson v. Transp. Agency*, 480 U.S. 616, 672 (1987) (White, J., dissenting)). And given that *this* court has never interpreted the term "person" in the child abuse statute,[5] we do not find such legislative inaction instructive. *See Welby Gardens*, 71 P.3d at 998 n.8 (noting that it was not surprising that the

---

[5] The parties in *Lage* did not file a petition for certiorari review.

legislature had not amended a statutory definition where the supreme court had never interpreted the subject term in the given context).

¶66 The prosecution further contends, as did Judge Webb in his dissent to the division majority on this issue, that because the child abuse statute contains no definition of "person," and because definitions of that term in other criminal contexts are inapplicable in this context, we should apply the common law "born alive" doctrine. The "born alive" doctrine provides that "a fetus that suffers a prenatal injury at the hands of a third party and is then born alive is capable of supporting certain criminal charges against the third party." 62A Am. Jur. 2d *Prenatal Injuries, Etc.* § 40; Restatement (Second) of Torts § 869(1) (Am. Law Inst. 1979) ("One who tortiously causes harm to an unborn child is subject to liability to the child for the harm if the child is born alive.").

¶67 While "[c]ommon-law crimes are abolished and no conduct shall constitute an offense unless it is described as an offense" by the legislature, this statutory provision does not "affect the use of case law as an interpretive aid in the construction of the provisions of this code." § 18-1-104(3), C.R.S. (2019); *see Allen v. People*, 485 P.2d 886, 887–88 (Colo. 1971) (recognizing "that the common law may be used in aid of the meaning to be given statutory language").

¶68 This court has never explicitly adopted or applied the common law "born alive" doctrine, though we have impliedly recognized it in the civil law context.

*See Empire Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, 764 P.2d 1191, 1193, 1195–96 (Colo. 1988) (approving, in a medical malpractice insurance case in which we were not asked to decide, and did not in fact rule on, the validity of the underlying judgment that granted recovery to a child who had suffered injury in utero but was subsequently born alive with severe mental impairments and physical disabilities); *see also Pizza Hut of Am., Inc. v. Keefe*, 900 P.2d 97, 101 (Colo. 1995) ("If a child dies after birth as a result of prenatal injuries, a surviving parent may bring a wrongful death claim derived from the child's injuries.").

¶69 In the criminal context, however, this court has never recognized the doctrine even by implication; thus, there is no Colorado case law to illuminate our interpretation of the child abuse statute. Given this absence of case law, we do not believe reliance on this doctrine clarifies the legislative intent. *See, e.g., Taylor v. United States*, 495 U.S. 575, 594 (1990) ("This Court has declined to follow any rule that a statutory term is to be given its common-law meaning, when that meaning is obsolete or inconsistent with the statute's purpose."). Further, we are particularly concerned that adopting the "born alive" doctrine to define a criminal element would usurp the role of the legislature. Therefore, we decline the temptation to make law, no matter how sympathetic the alleged victim. Accordingly, to the extent *Lage* conflicts with this opinion, we overrule it.

30

¶70 Because the legislature has not provided a definition of "person" in the child abuse statute, and because we have been unable to discern the legislature's intent using various aids of statutory construction, we resort to the rule of lenity. The rule of lenity provides that, when we cannot discern the legislature's intent, "ambiguity in the meaning of a criminal statute must be interpreted in favor of the defendant." *People v. Summers*, 208 P.3d 251, 258 (Colo. 2009) (quoting *People v. Thoro Prods. Co.*, 70 P.3d 1188, 1198 (Colo. 2003)). This is "a rule of last resort," and is to be "invoked only 'if after utilizing the various aids of statutory construction, the General Assembly's intent remains obscured.'" *Id.* (quoting *Thoro Prods.*, 70 P.3d at 1198).

¶71 And, applying the rule of lenity here, we conclude that a "person," as that term is used in the child abuse statute, does not include a fetus who is later born alive. Therefore, we conclude that Jones cannot be retried for the crime of child abuse based on his alleged conduct here.

### III. Conclusion

¶72 We affirm the court of appeals' judgment. Accordingly, we reverse Jones's judgment of conviction, vacate his sentences, and remand the case for a new trial. On remand, the prosecution may not retry Jones for child abuse based on Jones's alleged conduct giving rise to the underlying charges.

**JUSTICE BOATRIGHT** dissents, and **CHIEF JUSTICE COATS** and **JUSTICE SAMOUR** join in the dissent.

JUSTICE BOATRIGHT, dissenting.

¶73    Today, the majority usurps the legislature's authority by rewriting the definition of "child" in the child abuse statute. To do so, it relies on the rule of lenity—a rule of last resort—to add words to that statute that simply do not exist and, as a result, the majority fails to give effect to legislative intent. In my view, the majority makes a policy decision. The majority's rewrite of the statute goes well beyond our role in interpreting statutes and its use of the rule of lenity under these circumstances is unwarranted for three reasons. First, the majority's rejection of the common law born alive doctrine, which permits prosecutions for injuries caused to a fetus in utero that is later born alive, runs contrary to our precedent that statutes "may not be construed to abrogate the common law unless such abrogation was clearly the intent of the general assembly." *Robbins v. People*, 107 P.3d 384, 387 (Colo. 2005). Without question, the legislature has never expressed *any* intent to abrogate the common law born alive doctrine in the child abuse statute, leaving that doctrine viable. Second, the majority's decision disregards what the legislature has done—and more specifically, not done—to the crime of child abuse following a court of appeals decision over a decade ago in *People v. Lage*, 232 P.3d 138 (Colo. App. 2009). In *Lage*, the court of appeals held that a defendant *could* be charged with child abuse when he injured a fetus in utero who was born alive via an emergency cesarean section but died shortly thereafter.

1

Hence, that has been the law since that time and the legislature is aware of that, and despite amending the child abuse statute three times since the court of appeals' decision in *Lage*, the legislature has not amended the child abuse statute to prohibit such prosecutions. Third, the majority's decision not only ignores our well-established principles that we construe the legislature's decision to omit qualifying language as intentional and refrain from adding words to a statute but does just the opposite; it actually imports limiting language—from other articles in the criminal code—into the child abuse statute. I disagree with that course of action. I submit, rather, that any one of these three reasons would be sufficient to make the rule of lenity inapplicable in this case. Therefore, I would utilize our core principles of determining legislative intent, and in so doing, I would conclude that Jones can be charged with and convicted of child abuse for inflicting devastating, life-long injuries to the child here.

¶74 I also disagree with the majority's conclusion that the trial court's exclusion of Jones's parents during their grandchildren's testimony constituted a closure. In my view, when people are excluded from the courtroom *for their conduct*, as was the case here, that exclusion is not a closure that implicates the Sixth Amendment. Hence, instead of remanding for a new trial due to structural error, as the majority does, we should review these exclusions for an abuse of discretion.

¶75 Accordingly, I respectfully dissent.

## I. Jones Can Be Properly Charged with and Convicted of Child Abuse Resulting in Serious Bodily Injury.

¶76     After laying-in-wait, Jones shot his estranged wife, who was pregnant with another man's child, in the abdomen, killing her and gravely injuring her unborn child, who was delivered alive shortly after the shooting via an emergency cesarean section.  As a result, the child, a baby girl, has life-long disabilities.  In addition to convicting Jones of first-degree murder, a jury convicted Jones of child abuse resulting in serious bodily injury pursuant to section 18-6-401(1)(a), C.R.S. (2019).

¶77     That section provides that "[a] person commits child abuse if such person causes an injury to a child's life or health . . . that ultimately results in the death of a child or serious bodily injury to a child."  § 18-6-401(1)(a).  This statute defines a child as "a person under the age of sixteen years."  § 18-6-401(2).  The statute is silent, however, as to whether a person can be charged with child abuse for injuries caused to a fetus in utero that is later born alive.  Furthermore, there is no generally applicable definition of "person" or "child" in the Criminal Code.[1]  Hence, the majority is correct in its conclusion that "the child abuse statute is silent as to

---

[1] While the general definitions applicable to all Colorado statutes do provide definitions of both "child" and "person," these definitions provide no guidance on the question presented here.  *See* § 2-4-401(1.1), (8), C.R.S. (2019).

whether an unborn fetus is a 'child.'" Maj. op. ¶ 58. But the majority then relies on the rule of lenity to "conclude that a 'person,' as that term is used in the child abuse statute, does not include a fetus who is later born alive." *Id.* at ¶ 71. In so doing, the majority uses a "rule of last resort" to add words to the child abuse statute that simply do not exist and ignores the legislature's changes—and more significantly, lack of changes—to the child abuse statute following *Lage*. As a result, the majority usurps the legislature's authority to amend—or not amend—a statute and ignores the legislature's intent.

¶78 In interpreting a statute, our primary goal is to give effect to the legislature's intent. *McCoy v. People*, 2019 CO 44, ¶ 37, 442 P.3d 379, 389. If the language is clear, we apply it as written. *Id.* at ¶ 38, 442 P.3d at 389. If, however, the statute is silent or susceptible to more than one possible interpretation, we may then resort to extrinsic aids of construction. *Id.* These additional aids include, for example, relying on the common law in the absence of legislative action, looking at the legislative action or inaction following a court decision, and examining the legislature's decision to include or omit qualifying language in certain statutes but not others. If, *and only if*, the legislature's intent remains unclear after utilizing all of the different aids of statutory construction may we then resort to the rule of lenity. *People v. Summers*, 208 P.3d 251, 258 (Colo. 2009). In other words, the rule of lenity is a Hail Mary pass; it is a "rule of last resort." *Id.* (quoting *People v. Thoro*

4

*Prods. Co.*, 70 P.3d 1188, 1198 (Colo. 2003)). And without question, "the rule of lenity should not be applied to defeat the evident intent of the General Assembly." *Thoro Prods.*, 70 P.3d at 1198.

¶79 Following this court's principles of statutory construction, in their proper order, we are able to discern the legislative intent of the child abuse statute without resorting to the rule of lenity, as the majority does, for the following three reasons: (1) the common law born alive doctrine applies because the legislature has never expressed a clear intent to abrogate it; (2) over ten years ago *Lage* adopted the common law born alive doctrine to permit such prosecutions and since that time the legislature has never disapproved of *Lage*; and (3) the decision to omit qualifying language in the child abuse statute, while including it in other statutes, demonstrates that the legislature's intent was to permit child abuse prosecutions on facts like those in this case. Applying these different tools demonstrates that the rule of lenity is simply inapplicable here because the legislative intent is discernible utilizing the principles of statutory construction that we employ in nearly every case that requires us to make that determination.

¶80 First, the majority rejects "adopting the [common law] 'born alive' doctrine to define a criminal element" because it is concerned doing so "would usurp the role of the legislature." Maj. op. ¶ 69. But this turns a key principle of statutory construction on its head because when the legislature is silent with respect to a

certain definition in a statute, we presume that it is subject to the common law. *Robbins*, 107 P.3d at 387–88; *see also Bradley v. People*, 9 P. 783, 786 (Colo 1886) ("The common law is . . . to be taken into account in construing a statute."). In other words, the common law becomes our starting point for interpretation. And the common law born alive doctrine permits a prosecution for injuries caused to a fetus in utero that is later born alive. 62A Am. Jur. 2d *Prenatal Injuries, Etc.* § 40; Restatement (Second) of Torts § 869(1) (Am. Law Inst. 1979) ("One who tortiously causes harm to an unborn child is subject to liability to the child for the harm if the child is born alive."); *see Lage*, 232 P.3d at 143–44; *see also State v. Hammett*, 384 S.E.2d 220, 221 (Ga. App. 1989); *People v. Bolar*, 440 N.E.2d 639, 643–44 (Ill. App. 1982); *State v. Soto*, 378 N.W.2d 625, 628–29, 628 n.8 (Minn. 1985) (collecting cases from courts across the United States that have adopted or used the common law born alive doctrine); *People v. Hall*, 557 N.Y.S.2d 879, 883 (N.Y. App. Div. 1990); *Cuellar v. State*, 957 S.W.2d 134, 138–40 (Tex. App. 1997). Indeed, the majority acknowledges that this doctrine exists. *See* Maj. op. ¶ 66. But the majority then ignores this court's longstanding principle "that a statute may not be construed to abrogate the common law unless such abrogation was clearly the intent of the general assembly." *Robbins*, 107 P.3d at 387; *Preston v. Dupont*, 35 P.3d 433, 440–41 (Colo. 2001); *Robinson v. Kerr*, 355 P.2d 117, 119–20 (Colo. 1960). The legislature has never expressed a clear intent, or any intent for that matter, to abrogate the

6

common law born alive doctrine in the child abuse statute, which is particularly significant given that when the legislature has wished to abrogate the common law born alive doctrine for other criminal offenses—like homicide, for example—it has done so explicitly. Specifically, the legislature defined "person," when referring to the victim of a homicide, as "a human being who had been born and was alive at the time of the homicidal act." § 18-3-101(2), C.R.S. (2019). The use of this language is an example of explicit intent to abrogate the common law born alive doctrine for homicide offenses. In the child abuse statute, however, there is no clear intent to abrogate the common law. There is silence. The definition of "child" has remained unchanged. Hence, our precedent requires us to rely on the common law to construe the criminal code when the legislature is silent on certain aspects of codified offenses. *Robbins*, 107 P.3d at 387, 390 ("Absent such clear intent, statutes must be deemed subject to the common law."). Accordingly, contrary to the majority's contention that adopting the born alive doctrine "would usurp the role of the legislature," the opposite is true; the born alive doctrine remains viable and applies here because the legislature has never expressed a clear intent to abrogate it for the crime of child abuse.

¶81 Second, in the simplest of terms, the majority does in two paragraphs what the legislature has declined to do for over ten years: it redefines the definition of "child" in the child abuse statute. That is significant because the court of appeals,

7

following this court's own long-established precedent to construe statutes in accordance with the common law when there is no clear intent to abrogate it, adopted the common law born alive doctrine and defined "child" in the child abuse statute to include a fetus injured in utero that is later born alive. *Lage*, 232 P.3d at 143–44 ("[W]e conclude that the term 'child' used in [the child abuse statute] . . . include[s] a fetus who is injured while in the womb, is subsequently born and lived outside the womb, and then died from the injuries sustained."). In that case, a defendant was charged with, among other offenses, reckless child abuse resulting in death after he caused a head-on collision with a woman who was eight-and-a-half months pregnant. *Id.* at 139. The child was delivered alive but died a little over one hour later. *Id.* Because the child abuse statute was silent as to whether the defendant could be charged with child abuse for injuring a fetus that was later born alive, the court of appeals turned to the common law born alive doctrine. *Id.* at 143–44. As a result, the *Lage* majority concluded that the defendant could properly be charged with child abuse after he injured a fetus in utero that was later born alive. *Id.* In sum, the court of appeals did exactly what the rules of statutory construction dictate; it looked to the common law to help construe the child abuse statute.

¶82 That has remained the law since that time. It has remained the law because the legislature has not done anything in response to *Lage*. Again, the legislature

8

has never clearly expressed its intent to disapprove of *Lage* or to abrogate the common law born alive doctrine. The majority downplays the significance of this legislative inaction and declines "to infer legislative intent from the fact that the legislature has not amended the definition of 'child' or 'person' in the child abuse statute following [*Lage*]." Maj. op. ¶ 63.[2] But again, that is directly contrary to one of our bedrock principles of statutory interpretation: "The legislature's actions (and inactions) are significant because when the legislature amends a statute, it is presumed that it 'is aware of, and approves of, case law interpreting that statute.'" *Carrera v. People*, 2019 CO 83, ¶ 29 449 P.3d 725, 731 (quoting *Diehl v. Weiser*, 2019 CO 70, ¶ 25, 444 P.3d 313, 319); *see also Johnson v. Transp. Agency*, 480 U.S. 616,

---

[2] The majority relies on *Welby Gardens v. Adams County Board of Equalization*, 71 P.3d 992, 998 n.8 (Colo. 2003), to decline "to infer legislative intent from the fact that the legislature has not amended the definition of 'child' or 'person' in the child abuse statute following [*Lage*]." Maj. op. ¶ 63. But such reliance is misplaced. *Welby Gardens* does not stand for the principle that legislative inaction is never probative of legislative intent. Instead, it simply details that legislative inaction *in that case* was not particularly helpful. Indeed, a careful reading indicates that the court felt legislative inaction *in that case* "[was] not surprising" because two of the cases that interpreted the statute were not published, and therefore had no precedential value, and the third case had such a "limited scope" that it "[was] not extraordinary" that the legislature had not responded. *Welby Gardens*, 71 P.3d at 999 ("Given the limited scope of the court's decision, we would not expect the legislature to amend the statute one way or another in response."). The opposite is true here: *Lage* was a published decision, not limited in scope, and the legislature did amend the child abuse statute three times after *Lage* but chose not to abrogate that holding. Hence, the lack of a legislative response here is quite telling.

629 n.7 (1987) (finding "the absence of congressional efforts to amend [a] statute to nullify [a prior decision]" probative of legislative intent); *Leonard v. McMorris*, 63 P.3d 323, 331 (Colo. 2003) ("We presume that the General Assembly knows the pre-existing law when it adopts new legislation or makes amendments to prior acts."); *People v. Swain*, 959 P.2d 426, 430–31 (Colo. 1998) ("Under an established rule of statutory construction, the legislature is presumed, by virtue of its action in amending a previously construed statute without changing the portion that was construed, to have accepted and ratified the prior judicial construction."); *Tompkins v. DeLeon*, 595 P.2d 242, 243–44 (Colo. 1979) ("When the legislature reenacts or amends a statute and does not change a section previously interpreted by settled judicial construction, it is presumed that it agrees with [the] judicial construction of the statute."). Case law from the Supreme Court and our own court makes it clear that if the General Assembly had disapproved of *Lage*, then it would have amended the statute. *See, e.g.*, *Johnson*, 480 U.S. at 629 n.7 ("[W]hen Congress has been displeased with our interpretation of [a statute], it has not hesitated to amend the statute to tell us so."); *Fierro v. People*, 206 P.3d 460, 462–64 (Colo. 2009) (recounting a series of legislative changes that occurred in direct response to several court decisions). It has not—for over ten years—and this lack of legislative amendments to the child abuse statute after *Lage*, despite amending the very same statute three separate times without changing the portion *Lage*

10

construed, establishes that the legislative intent was to permit prosecutions like the one here.

¶83 The majority attempts to justify that this "legislative inaction [is not] instructive" because *Lage* was a court of appeals opinion, not an opinion of "*this* court." Maj. op. ¶ 65. In attempting to lessen the import of *Lage*, the majority implies that published court of appeals opinions create some sort of lesser laws by stating that "this court has never recognized the doctrine." Maj. op. ¶ 69. But this attempt to distinguish *Lage* is simply not accurate. Published court of appeals opinions are binding on lower courts and "must be followed as precedent by all lower court judges in the state of Colorado." C.A.R. 35(e); *see also Chapman v. Harner*, 2014 CO 78, ¶ 11, 339 P.3d 519, 522 (detailing that an opinion was "binding upon trial courts as a published court of appeals opinion"); *Patterson v. James*, 2018 COA 173, ¶ 40, 454 P.3d 345, 353 ("[P]ublished opinions are binding precedent for all lower court judges."). The legislature recognizes this very fact and thus, contrary to the majority's suggestion, does not wait for *this* court to interpret a statute before it steps in to disapprove of a judicial construction. It also acts when it disapproves of a court of appeals decision. *See, e.g., City of Colo. Springs v. Powell*, 156 P.3d 461, 467 (Colo. 2007) (explaining that "the General Assembly's decision not to alter the definition of [a term in a statute] following th[o]se [court of appeals] cases—even though it made several other amendments

11

to the [statute] after th[o]se decisions—[w]as evidence of its acquiescence to the judicial construction of the terms in those [court of appeals] opinions"). Hence, contrary to the majority's contention, the legislative inaction here is instructive because *Lage* has been the law that all lower courts in this state have been required to follow for over ten years. The legislature has never altered that law.

¶84 This legislative inaction is significant for another reason. Judge Connelly dissented in *Lage* and declined to conclude that a defendant could be prosecuted for inflicting injuries on a fetus in utero that is later born alive in that case. *Lage*, 232 P.3d at 145 (Connelly, J., concurring in part and dissenting in part). But in his dissent, he specifically asked for the legislature to act, stating, "This is an area that cries out for new legislation." *Id.* at 146. Despite this plea, the legislature has not acted to alter the majority's conclusion in *Lage*. This speaks volumes. It reinforces the conclusion that the legislature intended to permit prosecutions for child abuse like the one we have in this case.

¶85 Third, "we construe the legislature's decision to omit such qualifying language . . . as intentional, and, of course, we must refrain from adding words to the statute." *Mook v. Bd. of Cty. Comm'rs of Summit Cty.*, 2020 CO 12, ¶ 35, 457 P.3d 568, 576 (finding that the legislature's omission of qualifying language was intentional and disapproving of an interpretation that added limitations to a statute that did not exist). Despite that clear precedent, the majority does just the

opposite and both ignores the legislature's decision to omit limiting language in the definition of "child" or "person" in the child abuse statute and then goes one step further and imports limiting language from different statutes in which the legislature has used different definitions.

¶86    This disregards the fact that the legislature uses *different* definitions in *different* articles for *different* crimes. That means that just because the legislature defines a person in one statute does not mean that definition applies to all statutes. If the legislature wanted a definition of person to be universal to all crimes, then it would have said so. It has not. In fact, it has done the opposite. The legislature defines "person" differently for different crimes. In Article 3, a "'[p]erson,' *when referring to the victim of a homicide*, means a human being who had been born and was alive at the time of the homicidal act." § 18-3-101(2) (emphasis added). In that statute, the legislature decided to exclude a fetus who was in utero at the time of the offense. Similarly, in Article 3.5, Offenses Against Pregnant Women, the legislature included a personhood disclaimer, which provides that "[n]othing *in this article* shall be construed to confer the status of 'person' upon a human embryo, fetus, or unborn child at any stage of development prior to live birth." § 18-3.5-110, C.R.S. (2019) (emphasis added). Again, the legislature decided to exclude a fetus who was in utero at the time of the offense. Under the child abuse statute, in Article 6, however, a "'child' means a person under the age of sixteen years."

13

§ 18-6-401(2). Here, the legislature chose to omit any limitations in the child abuse statute. But despite this legislative choice, the majority decides that this omission was just a simple mistake, an oversight, and imports limitations from other statutes. This is simply improper. The different definitions of what constitutes a "person" or "child" for different crimes reflect policy decisions that this court should not alter. Hence, a legislative decision to omit qualifying language in the child abuse statute indicates that the omission was intentional.

¶87 Had the legislature chosen to limit the definition of "person" or "child" to only those already born and alive in the child abuse statute, the legislature could have used language similar to that used for homicide offenses or offenses against pregnant women. Indeed, those statutes demonstrate that the legislature "knew how to do so." *See, e.g.*, *Hernandez v. Ray Domenico Farms, Inc.*, 2018 CO 15, ¶ 12, 414 P.3d 700, 703–04 (explaining that had the legislature intended to use similar limiting language from one section of a statute in another section, it "knew how to do so"). Yet the legislature has not done so here, and we should heed that decision.

¶88 In sum, the rule of lenity is inapplicable in this case. It is a rule of last resort that is intended to resolve "ambiguity in the meaning of a criminal statute" only after we have exhausted all other options of statutory construction to discern the legislative intent. *See Summers*, 208 P.3d at 258. We should never reach the rule of lenity in this case.

¶89 In addition to these three reasons detailed above, common sense demonstrates why the legislature did not intend to preclude a defendant from being charged with child abuse when he causes injuries to a fetus in utero that is later born alive. Here, the defendant shot his estranged wife in the abdomen knowing that she was pregnant with another man's child. Where she was shot is telling. He intended to kill the unborn child as much as he intended to kill his estranged wife. Now, the child suffers from severe neurological and developmental disabilities that will persist throughout her life. She lacks muscle control, is unable to swallow without assistance, suffers from vision and hearing loss, and may never be able to walk or talk. As a result of Jones's actions, this child stands as an independent victim, separate and apart from her mother. She will suffer for her entire life because of the defendant's actions. Surely the legislature did not intend to disregard her as a victim.

¶90 As a final note on this issue, while I agree with the majority's statement that the homicide, unlawful termination of pregnancy, and child abuse statutes cannot be read in pari materia because the statutes don't involve the same subjects and cover different harms, the majority is, in effect, doing the very thing it claims to be rejecting. Both the homicide and unlawful termination of pregnancy statutes, by their plain terms, do not include a fetus that is later born alive. § 18-3-101(2) ("'Person', when referring to the victim of a homicide, means a human being who

15

had been born and was alive at the time of the homicidal act."); § 18-3.5-110 ("Nothing in this article shall be construed to confer the status of 'person' upon a human embryo, fetus, or unborn child at any stage of development prior to live birth."). The child abuse statute contains no similar limitation, yet the majority — under the guise of the rule of lenity — imports into the statute that it too, like the homicide and unlawful termination of pregnancy statutes, does not include a fetus that is later born alive. In effect, it took the result that applying in pari materia would provide and used the rule of lenity to get there. This is an action that I cannot join.

¶91 Accordingly, for the aforementioned reasons, I believe that a defendant can be charged with and convicted of child abuse resulting in serious bodily injury when the defendant causes injuries to a fetus in utero that is later born alive.

## II. The Trial Court's Exclusion of Jones's Parents Was Not a Closure Implicating the Sixth Amendment.

¶92 The majority also concludes that the trial court committed structural error by excluding Jones's parents from the courtroom during the testimony of his two children. But, in my view, this misses the mark because it ignores the fact that there is a difference between a courtroom closure and a trial court's exclusion of certain spectators because of their behavior. The former implicates the Sixth Amendment, whereas the latter does not. Excluding people whose conduct negatively impacts a proceeding is a necessary and permissive exercise of the

16

court's discretion to control the courtroom. In my opinion, the majority conflates the two.

¶93 Criminal defendants are guaranteed a right to a public trial under both the U.S. and Colorado Constitutions. U.S. Const. amends. VI, XIV; Colo. Const. art. II, § 16. "The requirement of a public trial is for the benefit of the accused," *Waller v. Georgia*, 467 U.S. 39, 46 (1984), and "enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system," *Press-Enter. Co. v. Superior Court*, 464 U.S. 501, 508 (1984).

¶94 While mindful of the importance of the right to a public trial and the significant protections it confers to defendants, the right to a public trial is not absolute and trial judges must have sufficient discretion to control their courtrooms. *See Illinois v. Allen*, 397 U.S. 337, 343 (1970) ("[T]rial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case."); *see also People v. Aleem*, 149 P.3d 765, 773 (Colo. 2007) (noting the "trial court's inherent authority to control the courtroom"). When a court exercises that discretion and excludes a spectator for cause, that exclusion does not constitute a Sixth Amendment closure. *State v. Lormor*, 257 P.3d 624, 628–29 (Wash. 2011); *see also People v. Angel*, 790 P.2d 844, 846–47 (Colo. App. 1989). This is so because the "power to control the proceedings must include the power to remove distracting spectators, or else it

would be meaningless," and "[a]ny other rule would leave a trial court judge unable to keep the order necessary for a fair proceeding." *Lormor*, 257 P.3d at 629.

¶95  Both *Lormor* and *Angel* are instructive here.[3]  In *Lormor*, even though the child was not at fault, a trial court excluded the defendant's daughter from the courtroom because she was on a ventilator, which the court concluded would pose a distraction during the trial. *Id.* at 625–26.  In that case, the Supreme Court of Washington held that no closure had occurred and reviewed the exclusion for an abuse of discretion, explaining that the trial court "has the power to preserve and enforce order in the courtroom and to provide for the orderly conduct of its proceedings." *Id.* at 629.  Similarly, in *Angel*, a division of the Colorado Court of Appeals concluded that excluding certain spectators from the courtroom while a witness testified did not violate a defendant's right to a public trial when the presence of certain persons in the courtroom caused the witness to lose her composure. 790 P.2d at 846–47.

---

[3] The majority concludes that reliance on *Lormor* "seems misplaced" because "unlike in *Lormor*, here there was no disruption in the courtroom."  Maj. op. ¶¶ 34–35.  But this ignores the reality that judges must have the ability to control their courtrooms.  There does not need to be an actual disruption in the courtroom. The court just needs good reasons to believe that there will be courtroom disruptions if it does not take some course of action.

¶96    In my opinion, the same reasoning applies here.  On the morning of the fifth day of the trial, the prosecutor requested that the children's paternal grandparents (Jones's parents) be excluded from the courtroom when two of Jones's and the victim's children testified for the prosecution.  The prosecution detailed that "[t]he Court knows that there is a [dependency and neglect proceeding] . . . that is in tandem and that all parties were asked to not speak to the kids about any of the court proceedings,"[4] but that over the weekend, during a visit with Jones's children, the grandmother had violated that admonition by commenting that one of the grandchildren would be testifying at his father's trial.  This put the child "into a bit of a tailspin" and "sent him very much on edge."  The court granted the prosecution's request to exclude the defendant's parents during the children's testimony, explaining that, "given the circumstances, I will order that neither be present during the children's testimony."  While no further record was made as to the court's reasons for excluding Jones's parents, the trial judge's statement about

---

[4] The prosecutor used the word "asked."  Even without the dependency and neglect proceeding's record, I am confident that this was not a suggestion or a mere request by the judge in the dependency and neglect proceeding.  Rather, experience dictates that this was an order regarding visitation.  The record here, however, does not establish that it was in fact an order.  Therefore, in an abundance of caution, I will call the court's directive to the grandparents to not discuss the court proceedings an admonition.

"the circumstances" indicates he excluded them based on their conduct. Indeed, the trial judge was also presiding over the dependency and neglect proceeding of Jones's children. In that case, the judge admonished the grandparents to not discuss the criminal proceedings with the children. Despite that admonishment, the grandmother did just that. And, as a result, it negatively impacted the children in a significant way. In response, the court ordered that the grandparents could not be in the courtroom when the children testified. While the court could have—and should have—made a more thorough record regarding its reasons for removing the grandparents, we can discern the court's rationale.[5] It is cause and effect. Hence, we should be reviewing the trial court's decision to exclude the grandparents based on their conduct for an abuse of discretion. But the majority minimizes the need for the trial court to control behavior that can impact the truth-seeking function of a trial and instead jumps to a courtroom closure and structural error.

¶97    The majority also contends that "as to Jones's mother, there is little to nothing in the record to support the conclusion that her presence at trial would have created the potential for disruption or witness intimidation." Maj. op. ¶ 35.

---

[5] The trial court should have described what specific action it took in the dependency and neglect proceeding.

But the majority ignores a critical fact in this case. Defense counsel agreed with the court that the grandmother's presence could be problematic. Indeed, defense counsel stated, on the record, that "I certainly understand why the Court would order that [she be excluded]. [She] is potentially very emotional about it." Furthermore, there is actually nothing in the record that shows that she was even excluded by the court's order. In fact, the record reflects the opposite point: Defense counsel stated on the record that "*I do not expect [Jones's mother] to be present*." (Emphasis added.) Hence, the record reflects that the exclusion order did not impact her presence because it does not appear that she was in attendance or that she even planned on attending. And defense counsel never supplemented the record showing that she was there or that she now wanted to attend.

¶98 Under the majority's holding today, trial courts will need to engage in a *Waller* analysis any time they exclude spectators who could influence witness testimony or disrupt judicial proceedings. In my view, this is unnecessary. *See Lormor*, 257 P.3d at 629 ("[I]t would make little sense to engage in a . . . *Waller* analysis every time an unruly spectator is ejected from the courtroom."). Furthermore, by requiring a *Waller* analysis before excluding a spectator when the judge has cause to believe there *will be* a disruption, I fear that judges will hesitate. Trial judges should not have to wait for a spectator to actually interfere, disrupt the proceedings, or influence a witness in his or her presence before they can

21

exclude a spectator if the court already has good cause to believe the spectator has violated an order or admonishment to refrain from discussing a case with a witness. Conduct outside of the courtroom can be considered. *See, e.g.*, *People v. Marquantte*, 923 P.2d 180, 183 (Colo. App. 1995) (explaining that a "court has broad discretion to determine what actions are necessary to regulate the courtroom" when a spectator makes "a specific threat . . . against a witness" outside of the courtroom). Indeed, if trial judges were required to wait for conduct to occur in open court, then they would run the risk of incomplete or influenced testimony, or even a mistrial.

¶99 In addition, the majority's decision to vacate Jones's convictions and remand for a new trial gives me significant pause, when, as here, we are dealing with a record that does not make it clear when Jones's parents were actually excluded. To be sure, the majority is correct that the court ordered that Jones's parents would be excluded during the testimony of Jones's children, A.J. and J.J. But there is nothing in the record about what happened. This is so despite the fact that the order came in the morning, and the children's testimony occurred after lunch. A.J. testified right after lunch, yet nothing in the record indicates whether the grandparents were present or ordered out. Then, after A.J.'s testimony, another witness testified before J.J. was called to the stand. Yet again, the record is completely silent about what happened with the grandparents. J.J. then testified

after this witness, but again, the record is silent about what happened with the grandparents. Finally, two additional witnesses testified after J.J., but again, the record is silent with what happened with the grandparents. What is established by the record is that the grandmother was not even present at court that day. Suffice it to say, the record does not reflect when, if, and for how long Jones's parents were actually excluded from the courtroom, which would enable us to determine the full nature of the court's exclusion in this case. Hence, I have concerns with reversing and remanding for a new trial on this record. And even though remanding for further factual findings is made more difficult here because the trial judge has since passed away, this portion of the record could be reconstructed in his absence.

¶100    The majority, however, concludes that remand "is not possible." Maj. op. ¶ 46. It shrugs its shoulders and contends that because the trial judge made no findings and has since passed away, we will never know why he excluded Jones's parents. But this misses the point; we already know *why* he excluded them: They had been admonished to not speak with the children about the criminal trial yet had done just that. What is missing is record support. In my view, the majority, in effect, is conflating the lack of record support regarding the existence of an order in the dependency and neglect case to mean that we don't know why he excluded the grandparents. If remanded, the record in the dependency and neglect

23

proceeding would establish if there was in fact an order. If there was not an order, then the exclusion was an abuse of discretion. If, however, there was an order that the grandparents did indeed violate, then the decision to exclude them was well founded. Even in the absence of the presiding judge, that portion of the record in this case could be reconstructed.

¶101 Finally, even if the majority is correct that the exclusion of Jones's parents here was an unjustified closure, I would conclude that it was trivial under the triviality standard that we adopted in *People v. Lujan*, 2020 CO 26, 461 P.3d 494. As we explained in *Lujan*, many jurisdictions have concluded that some closures are simply so trivial that they do not rise to the level of a constitutional violation. *Id.* at ¶¶ 16, 23, 461 P.3d at 498–500; *see also, e.g.*, *Peterson v. Williams*, 85 F.3d 39, 40, 43 (2d Cir. 1996) (explaining that "even an unjustified closure may, on its facts, be so trivial as not to violate" a defendant's public trial right). This triviality standard recognizes that certain courtroom closures do not implicate the values furthered by the public trial right, and thus do not warrant automatic reversal. *Lujan*, ¶¶ 24, 28, 461 P.3d at 499–500; *see also United States v. Perry*, 479 F.3d 885, 889–91 (D.C. Cir. 2007). The four primary values furthered by the public trial right include (1) "to ensure a fair trial," (2) "to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions," (3) "to encourage witnesses to come forward," and (4) "to discourage perjury." *Lujan*,

¶ 28, 461 P.3d at 500 (quoting *Peterson*, 85 F.3d at 43). If these values are not implicated, then even "the exclusion of a family member or friend may . . . not implicate the Sixth Amendment public trial guarantee." *Perry*, 479 F.3d at 890–91. Courts consider various nondeterminative factors when determining whether a closure was trivial, including: the duration of the closure, the substance of the proceeding during the closure, whether the proceedings were later memorialized in open court or placed on the record, and whether the closure was total or partial. *Lujan*, ¶ 19, 461 P.3d at 498–500; *see also Perry*, 479 F.3d at 890–91.

¶102 Applying the triviality framework to the facts here, I would conclude that any closure was trivial and does not warrant overturning Jones's convictions. The majority rejects the triviality framework to these facts for two primary reasons: (1) the court excluded the defendant's family members[6] and (2) the children's

---

[6] The majority relies extensively on *United States v. Rivera*, 682 F.3d 1223 (9th Cir. 2012), to support its conclusion that any closure here was not trivial because the court excluded the defendant's family members. Maj. op. ¶¶ 16, 23, 40, 41. But *Rivera* is distinguishable for two reasons. First, that case involved the exclusion of the defendant's son during the sentencing hearing. *Rivera*, 682 F.3d at 1230. As the Ninth Circuit explained, "the presence of the public at sentencing reminds the participants, especially the judge, that the consequences of their actions extend to the broader community" and "[f]riends and family . . . are particularly effective in this regard, because they are the individuals most likely to be affected by the defendant's incarceration." *Id.* Of course the son would be impacted by his father's sentencing. Hence, I agree that if we were talking about the exclusion of Jones's parents during his sentencing hearing then this would be a different case,

25

testimony was significant due largely to its duration.  Maj. op. ¶¶ 41–42.  In my

view, only relying on these two factors is insufficient.  To begin, while I do not

dispute "the important role the defendant's family plays during a trial," just

because the exclusion covered a family member does not immediately render a

closure non-trivial.  *See Perry*, 479 F.3d at 890–91 (holding that the exclusion of a

defendant's eight-year-old son from the entire trial was trivial and did not violate

the defendant's Sixth Amendment public trial right); *see also Kelly v. State*, 6 A.3d

396, 420 (Md. Ct. Spec. App. 2010) (finding that excluding the defendant's family

for two to three hours of voir dire was trivial and did not warrant reversal).  The

triviality standard requires a more balanced examination, looking at whether the

closure implicated the values that the Sixth Amendment seeks to further.

Additionally, while the majority is correct that the children's testimony spanned

146 pages, the testimony was not as significant as the majority claims, and the

duration, when looked at in context of the entire trial, tips in favor of this being

trivial.  This was a ten-day trial; the total transcript was nearly 2,200 pages, and 48

different witnesses testified.  It also should not be forgotten that defense counsel

---

and the reasoning from *Rivera* would be applicable.  But these are not the facts in
our case.  Second, the son in *Rivera* did nothing wrong.  Here, conversely, the court
excluded Jones's parents based on their conduct.

26

told the court that the grandmother was not even present on the day she was excluded and that he understood the reason for her exclusion. And even if she was there, the grandparents were presumably only excluded from the courtroom during the testimony of 2 of those 48 witnesses, which encompassed just a very small percentage of the trial (approximately 6 percent if measured by transcript pages). Nobody else was excluded from any portion of the trial, and the trial judge's order did not prevent the grandparents from being present during any other portion of the trial. And finally, even assuming for the sake of argument that the duration of the children's testimony was significant, as the majority concludes, it is important to recognize that "the length of time, by itself, is not dispositive." *Kelly*, 6 A.3d at 420.

¶103   In assessing whether the exclusion here was trivial, I turn to whether the exclusion implicated the values protected by the Sixth Amendment public trial right. *See Lujan*, ¶ 28, 461 P.3d at 500. And applying these four values to these facts warrants a determination, in my view, that this closure was trivial because these values were not implicated here. First, excluding the grandparents furthered, not diminished, the defendant's "right to a fair trial" because it prevented the grandparents from possibly influencing the children's testimony. Indeed, there was concern that the grandparents would negatively impact the children's testimony. Defense counsel seemingly admitted as much, at least with

respect to the grandmother, stating that "I certainly understand why the Court would order that [she be excluded]. [She] is potentially very emotional about it." In sum, no one benefits from testimony that is influenced. Second, the general public and press were not excluded, so the prosecutor and judge were still reminded of their "responsibility to the accused and the importance of their functions." Excluding two spectators did not change this. Third, excluding the grandparents did not discourage witnesses from coming forward; in fact, the defense had already decided that the grandparents would not be testifying in this trial and, conversely, the children did testify. Fourth, it seems that the exclusion furthered—rather than hampered—the goal of discouraging perjury because the record reflects concerns that the grandparents would influence the children's testimony. In sum, it does not appear that the exclusion here implicated the values furthered by the Sixth Amendment. Hence, even if I were to accept the majority's contention that the exclusion of Jones's parents here was an unjustified closure, under these facts, I would find that it was trivial.

### III. Conclusion

¶104 I believe that Jones can be properly charged with and convicted of child abuse for the life-long and devastating injuries that he inflicted on the child here. As such, I would affirm Jones's conviction for child abuse resulting in serious bodily injury. Additionally, when people are excluded from the courtroom for

28

their conduct, that exclusion is not a closure that implicates the Sixth Amendment. Hence, I would review these exclusions for an abuse of discretion. Accordingly, I respectfully dissent.

I am authorized to state that CHIEF JUSTICE COATS and JUSTICE SAMOUR join in this dissent.