The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

Summary
December 28, 2023

## 2023COA124

**No. 21CA1229, *Peo v. Gonzalez-Quezada* — Constitutional Law — Sixth Amendment — Right to Public Trial — Partial Courtroom Closure —*Waller* Test**

As a matter of first impression, a division of the court of appeals determines that the exclusion of a disruptive observer from a Webex electronic broadcast of the trial does not constitute a partial closure of the courtroom for purposes of a defendant's right to a public trial when the physical courtroom remains open to the public. Moreover, even if the exclusion of the observer could be considered a partial closure, the division concludes the trial court made adequate findings to justify a partial closure in accordance with *Waller v. Georgia*, 467 U.S. 39 (1984).

The concurring opinion emphasizes that the exclusion of a disruptive observer from an electronic broadcast should not be

considered a partial closure and therefore should not necessitate

findings under *Waller*.

COLORADO COURT OF APPEALS      **2023COA124**

---

Court of Appeals No. 21CA1229
Weld County District Court No. 19CR2595
Honorable Vicente G. Vigil, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Jaime Gonzalez-Quezada,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division III
Opinion by JUDGE SCHUTZ
J. Jones, J., concurs
Johnson, J., specially concurs

Announced December 28, 2023

---

Philip J. Weiser, Attorney General, William G. Kozeliski, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Jessica A. Pitts, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Jamie Quezada,[1] appeals his second degree murder conviction. We affirm. In doing so, we conclude that there was sufficient evidence for the jury to reject the statutory heat of passion sentence mitigator. We also conclude that the trial court did not violate Quezada's right of confrontation or his ability to effectively test the veracity of an eyewitness to the shooting. Finally, as a matter of first impression in Colorado, we conclude that the trial court did not deny Quezada his right to a public trial by excluding a disruptive observer from remotely viewing the trial.

I.     Procedural History and Background

¶ 2     The trial court admitted evidence from which the jury could reasonably have found the following facts. Jaime and Alejandra Nancy Quezada[2] were married for five years before the homicide. Prior to the marriage, Quezada had three children and Nancy had one child. They had problems throughout the marriage, and on or

---

[1] Quezada was erroneously charged under the name "Jamie Gonzalez-Quezada." His correct name is Jaime Quezada, and we refer to him as such.

[2] Alejandra Nancy Quezada, the defendant's ex-wife, goes by Nancy. We will refer to her by her first name to avoid confusion; we intend no disrespect in doing so.

around October 6, 2019, Nancy moved out of the marital home and stayed with a friend while she considered how to move forward.

¶ 3 Nancy worked as a personal trainer at a local gym. On October 9, 2019, at 4:18 a.m., she and the victim, Gilberto Marron, made plans to meet at the gym. They were in an intimate relationship. At around 4:47 a.m., Nancy and Marron got in the back seat of her car, which was in the gym's parking lot. Marron was on the passenger side, and Nancy was on the driver's side. What occurred in the car's back seat was disputed at trial. Nancy claimed that they went into the back seat so that he could give her a hug and then they started talking. She testified that she rested her head on Marron's lap for about five minutes during their conversation. Quezada contended at trial that she appeared to be performing fellatio on Marron.

¶ 4 Unbeknownst to Nancy and Marron, Quezada was also in the parking lot. The area was well-lit, and it was possible to see into other vehicles even though it was early in the morning. Quezada claimed that he decided to go to the gym that morning to say "hi" to Nancy. When he saw her place her head in Marron's lap, he retrieved his 9 mm pistol from the center console, drove up to the

passenger side of Nancy's car, got out of his truck, and fired at least one shot into the car through the back seat window. At some point, Nancy jumped from the back seat to the front of the car.

¶ 5      Marron got out of the car and tried to flee, but Quezada fired about five more shots, one of which struck Marron in the head, resulting in a fatal injury. Marron was shot a total of six times and died in the parking lot. Shortly after shooting Marron, Quezada allegedly said, "[T]his is what happens when you mess with married women." He also spoke to Nancy, saying something along the lines of, "[T]his is what you wanted, right?"

¶ 6      Quezada drove away in his truck. Nancy then immediately called the police. During the call, Nancy referred to Marron as a "friend." Police did not discover the intimate nature of their relationship until later.

¶ 7      Quezada turned himself in to the police about five hours after the shooting. Before doing so, he confided to friends and family that he had "wasted" someone after seeing that person with his wife. He also spoke with a bondsman. The People charged Quezada with one count of first degree murder, relating to Marron, and a count of reckless endangerment, relating to Nancy.

¶ 8     The jury trial, which took place in May 2021, was held under COVID-19 protocols. To limit the number of people who were physically present in the courtroom, the trial was also live streamed on Webex. The remote participants in the trial included the court-approved interpreters who provided interpretation for the benefit of Quezada's and Marron's family members. The court repeatedly reminded Webex observers to mute themselves during the trial. On the seventh day of the trial, the court disconnected a line participating via Webex because the observer at that phone number repeatedly failed to mute their microphone and the noise was disrupting the testimony.

¶ 9     The jury convicted Quezada of second degree murder and reckless endangerment. The court sentenced him to forty-eight years in the custody of the Colorado Department of Corrections.

## II.    Sufficiency of the Evidence

¶ 10    Quezada contends that the prosecution presented insufficient evidence to disprove the heat of passion mitigator. We disagree.

### A.    Standard of Review and Applicable Law

¶ 11    We review a sufficiency of the evidence claim de novo, evaluating "whether the relevant evidence, both direct and

4

circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt." *People v. Donald*, 2020 CO 24, ¶ 18 (quoting *Clark v. People*, 232 P.3d 1287, 1291 (Colo. 2010)). Our analysis is guided by four well-established principles. First, we give the prosecution the benefit of all reasonable inferences that might fairly be drawn from the evidence. *Id.* at ¶ 19. Second, we defer to the jury's resolution of the credibility of witnesses. *Butler v. People*, 2019 CO 87, ¶ 20. Third, we may not serve as a thirteenth juror by weighing various pieces of evidence or resolving conflicts in the evidence. *Id.* Fourth, a conviction cannot be based on guessing, speculation, conjecture, or a mere modicum of relevant evidence. *Donald*, ¶ 19.

¶ 12 A person commits murder in the second degree if the person knowingly causes the death of another person. § 18-3-103(1)(a), C.R.S. 2023. Second degree murder may be mitigated from a class 2 felony to a class 3 felony if it is committed under the heat of passion. Heat of passion is defined as a serious and highly provoking act by the intended victim that affected the defendant

5

sufficiently to excite an irresistible passion in a reasonable person. § 18-3-103(3)(b). But if, between the provocation and the killing, there is an interval sufficient for the voice of reason and humanity to be heard, the killing is a class 2 felony. *Id.* Heat of passion provocation is a mitigating factor for attempted second degree murder. *People v. Tardif*, 2017 COA 136, ¶ 6. If there is sufficient evidence to support giving an instruction on heat of passion, the prosecution is required to disprove the mitigator beyond a reasonable doubt. *Id.*

### B. Application

¶ 13     To support his contention that the People failed to meet their burden on the sentence mitigator, Quezada points to evidence in the record from which the jury could reasonably have concluded that he was acting under a sudden heat of passion: (1) he was unaware of Nancy's relationship with Marron until the events at issue; (2) he allegedly went to the gym to say hello to his wife; and (3) there were just a few seconds between when he saw Nancy lower her head into the victim's lap and when he fired the first shot.

¶ 14     The trial court properly instructed the jury on the People's "burden to prove beyond a reasonable doubt that Quezada was not

6

acting upon a sudden heat of passion." The court also properly instructed the jury on the definition of "heat of passion." Thus, the question is whether there was sufficient evidence from which the jury could conclude, beyond a reasonable doubt, that Quezada did not act under a sudden heat of passion when he murdered the victim. We conclude that there was.

¶ 15    The jury could have found against Quezada on the heat of passion mitigator based on the following facts: (1) Quezada was arguably lying in wait for Nancy and Marron to arrive; (2) Quezada knowingly placed himself in a situation where he could discover their relationship, thus undermining the suddenness component of the mitigator; (3) there was time for Quezada to reflect before he fired the fatal shot; (4) his statement to Marron about "messing" with married women may have indicated premeditation; and (5) his question to Nancy about whether this is what she wanted also may have led the jury to conclude that he was not acting under a heat of passion. Viewing this evidence in the light most favorable to the prosecution, we conclude that a reasonable jury could find beyond a reasonable doubt that the prosecution disproved the heat of passion mitigator, and thus reject Quezada's sufficiency challenge.

7

### III.   Fifth Amendment Invocation

¶ 16    Quezada also argues that the trial court erred by (1) allowing Nancy to testify even though she planned to invoke her Fifth Amendment rights as they related to sexual assault charges pending against her and (2) excluding extrinsic evidence that would have identified the victim of Nancy's alleged sexual assault.  We disagree.

#### A.   Fifth Amendment

#### 1.   Additional Facts

¶ 17    During the investigation into the shooting, Nancy revealed that she had a sexual relationship with Quezada's biological son, who was nineteen at the time of the disclosure.  Further investigation revealed that the relationship started when Quezada's son was a minor.  In April 2021, the month before Quezada's trial, Nancy was charged with one count of aggravated incest and two counts of sexual assault.  The prosecutor in that case was also the prosecutor in Quezada's case.

¶ 18    Quezada's defense counsel filed a motion in limine to exclude Nancy's testimony in light of her potentially invoking her Fifth Amendment right to remain silent.  The People filed a motion in

8

limine to exclude evidence of Nancy's charges or limit how much the jury could hear about them. The trial court held pretrial hearings on the respective motions and denied defense counsel's motion to bar Nancy's testimony in its entirety on the grounds that she could be effectively cross-examined without identifying Quezada's son as the alleged victim of the sexual assault. The trial court then entered an order prohibiting Quezada's counsel from asking Nancy who the victim of the alleged offense was but permitting counsel to introduce evidence that she had been charged with sexual assault involving incest allegations.

### 2. Standard of Review and Applicable Law

¶ 19 Both parties agree that the issue is preserved; however, they dispute which standard of review applies. Quezada contends that the trial court's ruling violated his right to confront witnesses and should be reviewed de novo. The People agree that the propriety of allowing a witness to testify knowing they will invoke a right to a degree that could deprive a defendant of the right of confrontation is reviewed de novo. But they assert that if the court's ruling is limited in a manner that does not deprive a defendant of the right to

9

effectively test the witness's credibility, the ruling is reviewed for an abuse of discretion.

¶ 20     We review de novo a possible Confrontation Clause violation. *People v. Dominguez-Castor*, 2020 COA 1, ¶ 67. "The Sixth Amendment right to confrontation and the Fifth Amendment right to due process of law require only that the accused be permitted to introduce all relevant and admissible evidence." *Id.* at ¶ 68 (quoting *People v. Harris*, 43 P.3d 221, 227 (Colo. 2002)). A Confrontation Clause violation may exist where a defendant "was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness." *Kinney v. People*, 187 P.3d 548, 559 (Colo. 2008) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986)).

¶ 21     "It does not follow, of course, that every restriction on a defendant's attempts to challenge the credibility of evidence against him, or even every erroneous evidentiary ruling having that effect, amounts to federal constitutional error." *Krutsinger v. People*, 219 P.3d 1054, 1062 (Colo. 2009). Thus, a defendant may successfully assert a constitutional violation only where "the trial court's ruling, under the circumstances of each case, effectively barred the

defendant from meaningfully testing evidence central to establishing his guilt." *Dominguez-Castor*, ¶ 70 (quoting *Krutsinger*, 219 P.3d at 1062).

¶ 22    Nonconstitutional evidentiary rulings, including those regarding cross-examination, are reviewed for an abuse of discretion. *People v. Campos*, 2015 COA 47, ¶ 26.

### 3.    Application

¶ 23    Quezada contends that Nancy's pending criminal matter was inextricably linked to Quezada's case. Thus, Quezada contends it was necessary to confront Nancy about the fact that Quezada's son was the victim of Nancy's alleged sexual assault. By precluding such testimony, Quezada says, the trial court deprived him of the opportunity to establish Nancy's bias and motive to testify against him.

¶ 24    The People reason that though defense counsel was prohibited from asking Nancy about the victim's identity, counsel was nonetheless able to cross-examine her about the fact that she was charged with sexual assault based on incest. Additionally, the People note that Quezada's counsel was allowed to test Nancy's credibility through questions about her divorce from Quezada, her

11

affair with Marron, her prior inconsistent statements to law enforcement, and her hopes of leniency on her pending charges. Therefore, the People contend Quezada was not deprived of his right to confrontation.

¶ 25 For the following reasons, we agree with the People that allowing Nancy to testify knowing that she would invoke her right to remain silent concerning the identity of the alleged victim of the assault did not deprive Quezada of his right to confrontation.

¶ 26 First, we disagree with Quezada's contention that the identity of the alleged sexual assault victim in Nancy's criminal matter was inextricably linked to the shooting. Quezada was not aware of the alleged abuse of his son until after his arrest. Thus, the fact that his son was the alleged victim could not have impacted his mental state at the time of the shooting.

¶ 27 Second, Nancy was a critical witness because she was the only person who could describe certain events surrounding the shooting. Her testimony provided the jury with valuable evidence about what occurred that morning.

¶ 28 Moreover, Quezada's counsel was not so constrained by Nancy's invocation of her right to remain silent that he could not

12

adequately cross-examine her. For example, defense counsel cross-examined her about inconsistencies and gaps in her story, her failure to disclose the romantic nature of the relationship with Marron to police, and the circumstances of her divorce from Quezada. Defense counsel also asked Nancy whether she was hoping for leniency from the prosecution in exchange for her testimony, and that questioning revealed that the pending charges included incest and sexual assault. There is nothing in the record to suggest that the limitation placed on Quezada's counsel effectively precluded counsel from being able to meaningfully test the evidence against Quezada. *Dominguez-Castor*, ¶ 70.

¶ 29 Based on this record, we conclude that the trial court did not err by denying defense counsel's motion to bar Nancy's testimony in its entirety.

B. The Exclusion of Other Evidence Regarding the Identity of the Victim of Nancy's Alleged Sexual Assault

¶ 30 Quezada also contends that the trial court erred by precluding his counsel from asking a detective to tell the jury the identity of Nancy's alleged sexual assault victim. He reasons that such evidence should have been permitted because it directly impacted

13

Nancy's credibility. The trial court excluded such evidence under CRE 608(b). Its ruling was based on two grounds. First, it concluded that Rule 608 supplanted common law methods of impeaching a witness's credibility. Second, the court concluded that Rule 608 only permits impeaching a witness's credibility on cross-examination.

### 1. Standard of Review Applicable Law

¶ 31 We review a trial court's evidentiary rulings for an abuse of discretion. *People v. Stewart*, 55 P.3d 107, 122 (Colo. 2002). A trial court abuses its discretion if its ruling is arbitrary, unreasonable, or unfair. *Id.* CRE 608(b) states as follows:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness other than conviction of crime as provided in [section] 13-90-101, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

We agree with Quezada that Rule 608(b) does not control this issue and the trial court erred by relying on it to preclude the testimony. However, we may affirm a trial court's ruling denying evidence on any basis supported by the record. *People v. Quintana*, 882 P.2d 1366, 1371 (Colo. 1994), *abrogated on other grounds by Rojas v. People*, 2022 CO 8; *People v. Everett*, 250 P.3d 649, 653 (Colo. App. 2010).

## 2. Application

¶ 32    We agree with Quezada that the trial court erred by concluding that Rule 608 displaced the common law rule permitting the introduction of extrinsic evidence through a third-party witness that impeaches another witness's testimony. *See, e.g., People v. Taylor*, 190 Colo. 210, 213, 545 P.2d 703, 705 (1976) ("[A] party who on cross-examination inquires into bias is not bound by the denial of the witness but may contradict him with the evidence of other witnesses."). We also conclude that CRE 608(b) does not limit impeaching testimony to that which is elicited solely through the cross-examination of the witness whose testimony is being impeached. *See, e.g., People v. Thomas*, 2014 COA 64, ¶ 43 ("We conclude that the doctrine of specific contradiction allowed this

15

evidence to be introduced here, and that CRE 608(b) is no impediment to the introduction of such evidence.").

¶ 33    Nonetheless, we conclude, for independent reasons, that the trial court properly excluded testimony that the identified victim in Nancy's sexual assault charges was Quezada's son.

¶ 34    CRE 403 applies to evidence offered under CRE 608(b). "[T]he trial court should 'exclude evidence that has little bearing on credibility, places undue emphasis on collateral matters, or has the potential to confuse the jury.'" *People v. Williams*, 2014 COA 114, ¶ 36 (quoting *People v. Knight,* 167 P.3d 147, 153 (Colo. App. 2006)).  Rule 403 precludes the admission of evidence if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

¶ 35    Recall that the trial court permitted introduction of the fact that Nancy had been charged with sexual assault and that the charges involved incest.  All that was excluded was testimony specifically identifying Quezada's son as the victim of the alleged assault.  Quezada argues that the identity of the victim was relevant

16

because it impacted Nancy's motive to lie. More specifically, Quezada argues that Nancy had a motive to lie because she understood that Quezada was likely to be called as a witness at her trial on the sexual assault charges, and she would benefit if Quezada was convicted of these homicide charges because he could then be impeached with his prior felony conviction. *See* § 13-90-101, C.R.S. 2023.

¶ 36    But any such motivation had nothing to do with the victim's identity. In other words, Nancy would have a motive to lie to obtain a conviction against Quezada regardless of whether the alleged victim in her case was Quezada's son or some other relative. And to the extent that Quezada argues that the fact his son was the victim makes it more likely that Quezada would be a witness at Nancy's trial, we reject the premise. Regardless of whether the victim was Quezada's son or some other family member, it was highly probable that Quezada would be called as a witness to testify about an alleged sexual assault of a family member that occurred while he and Nancy were married.

¶ 37    Thus, disclosing to the jury that Quezada's son was the alleged victim had de minimis, if any, relevance to the legitimate

17

assessment of Nancy's credibility.  On the other hand, the explosively prejudicial nature of such testimony is self-evident. Those who perpetrate sexual assaults against any person are viewed with significant scorn.  That prejudice is amplified when the victim is the child of a spouse.  Thus, the prejudicial impact of the proffered identification of Quezada's son was great, and it substantially exceeded the de minimis probative value of that evidence.

¶ 38     For these reasons, we conclude that Rule 403 precluded the admission of evidence that Nancy had been accused of sexually assaulting Quezada's son.  Therefore, we further conclude — albeit on different grounds — that the trial court did not abuse its discretion by excluding such evidence.

IV.   Public Trial

¶ 39     Quezada contends that the trial court deprived him of his right to a public trial by excluding a disruptive observer from the Webex live stream of the proceedings.  Specifically, he argues that the exclusion constituted a partial closure of the courtroom, and that the trial court's failure to make express findings under *Waller v. Georgia*, 467 U.S. 39 (1984), before excluding the observer deprived

18

him of his right to a public trial as guaranteed by the United States and Colorado Constitutions. *See* U.S. Const. amends. VI, XIV; Colo. Const. art. II, § 16. We disagree.

## A. Additional Facts

¶ 40 The trial in this case occurred during the COVID-19 pandemic. As was common during that period, the trial court live streamed the proceedings online using Webex. But the court also maintained public access to the courtroom itself, as it discussed in the following exchange:

> Prosecutor: I think, for the record, since the WebEx [sic] was off during the initial portion of Detective Finch's testimony, I — I — it — it should be clear that this is still an open courtroom, that people could come and go as they wanted, even though the WebEx [sic] feed wasn't working at that time.
>
> Court: I'm happy to make a record of that. I know that we do have some attendees present in person. I know that at previous portions of this proceeding, that we've had many people attending in person. The doors are unlocked. The courtroom is not closed to the public.
>
> . . . .
>
> Court: And the Court does note that the courtroom is open. There are several — probably a dozen or so people, if not more, present in the courtroom today. The Court also posted a message on its WebEx chat

19

function indicating the technical issues and informing the observers that they may observe in person if they are able to do so as space permits.

During the trial, the court apparently streamed the testimony of witnesses, but it disconnected the Webex feed during some portions of the trial. There were also occasional lapses in the streamed testimony, due to human error or technological limitations.

¶ 41    The court noted various occasions when one or more Webex observers failed to mute their microphones, resulting in noises and communications from those observers or those near them being broadcast into the courtroom. The court reminded participants on multiple occasions of the need to keep their microphones on mute unless they were specifically communicating something directly to the court.

¶ 42    One Webex observer repeatedly failed to mute themselves and disrupted the court proceedings. The court eventually interrupted a witness's testimony to confront that observer:

> So I have repeatedly warned the observers that they need to mute their microphone. We are conducting a trial.
>
> I have already had to expel the phone number starting with 9-1-7 who has been a repeat

20

offender and has repeatedly had their microphone unmuted and has caused background noise.

I am going to specifically tell whoever is observing by phone number 9-1-7 and ending in 6-5, I am going to expel you again from these proceedings. I have warned the observers multiple times to not have their microphones unmuted, and we have had background noise from this particular number multiple times.

It is an order of the Court that you be expelled from these proceedings and that you not continue to observe these proceedings due to the disruption that your failure to mute your microphone has provided multiple times.

So I am expelling you at this time and, again, you are not to return to observe these proceedings because you apparently cannot follow the instructions of the Court not to be disruptive.

The record does not disclose the identity of the excluded observer, or their relationship, if any, to Quezada or Marron.

¶ 43    Quezada characterizes the court's exclusion of the unidentified observer as a partial closure of the courtroom in violation of his right to a public trial. The People disagree, arguing that no closure occurred, and that even if this exclusion could be considered a partial closure, it did not violate Quezada's rights.

21

## B.    Standard of Review

¶ 44    Whether the trial court violated a defendant's right to a public trial presents a mixed question of fact and law. *People v. Hassen*, 2015 CO 49, ¶ 5. We accept the trial court's factual findings absent an abuse of discretion. *People v. Jones*, 2020 CO 45, ¶ 14. We review its legal conclusions, including the application of the determined facts to the controlling law, de novo. *Id.*

¶ 45    The parties disagree about whether Quezada preserved these issues, and relatedly what standards of review and reversal govern.

¶ 46    The People note that Quezada's counsel failed to object to the exclusion of the Webex observer at the time it occurred or at any other point during the trial. Consequently, the People argue, Quezada waived any error attributed to the exclusion order. *See Stackhouse v. People*, 2015 CO 48, ¶ 5 (finding waiver of the defendant's right to claim that he was denied a public trial where counsel was aware of the closure but failed to object); *Forgette v. People*, 2023 CO 4, ¶ 34 (finding waiver of the defendant's right to claim that he was denied a jury trial, even though a juror had slept through significant portions of trial testimony, because defense counsel did not make a contemporaneous objection). If we

22

conclude the issue was not waived, the People argue that any error should be reviewed under the plain error standard. We reverse for plain error only if the error was obvious and so undermined the fundamental fairness of the trial that it casts serious doubt on the reliability of the conviction. *Hagos v. People*, 2012 CO 63, ¶ 14.

¶ 47 Quezada counters that the court acknowledged that it had previously excluded the observer without informing the parties before doing so. Thus, Quezada contends, his attorney had no opportunity to object to this initial exclusion, and therefore waiver cannot bar his claim on appeal. *See People v. Rediger*, 2018 CO 32, ¶ 39 (Waiver is "the *intentional* relinquishment of a *known* right or privilege." (quoting *Dep't of Health v. Donahue*, 690 P.2d 243, 247 (Colo. 1984))).

¶ 48 Quezada argues that the initial exclusion of the observer should be reviewed for constitutional harmless error. Such an error requires reversal unless it was harmless beyond a reasonable doubt. *Hagos*, ¶ 11. With respect to the second exclusion of the offending observer, Quezada acknowledges his attorney had an opportunity to object and did not. Nevertheless, he claims the failure to object was the product of counsel's negligence rather than

23

a knowing decision. Therefore, he contends, the error was forfeited but not waived, and we should review for plain error. *People v. Garcia*, 2023 COA 58, ¶¶ 15-16 (forfeiture arises when a defendant neglects to make a timely objection; we review forfeited error under the plain error standard).

¶ 49    Quezada also contends that if we determine that the trial court's error amounted to a deprivation of his right to a public trial, any such error is structural and must be reversed irrespective of any prejudice analysis. *See Jones*, ¶ 45 (applying structural error to improper partial closure of courtroom in violation of defendant's right to a public trial).

¶ 50    We need not resolve the parties' competing positions on these issues, however, unless we conclude the trial court erred by excluding the disruptive observer. We turn now to that question, beginning with a summary of the applicable legal principles.

## C.    Applicable Law

¶ 51    The constitutional guarantee to a public trial serves multiple noble purposes. It protects the rights of a defendant because the public's observation reminds the court and counsel of their essential roles in ensuring that a defendant is treated fairly and has

24

their rights respected. *Id.* at ¶ 16. The presence of a defendant's family members and friends also reminds the participants of a defendant's humanity and the corresponding right to be treated with dignity. *See id.* In addition to promoting the accountability of the court and counsel, a public trial may also have the effect of encouraging potential witnesses to come forward with relevant information and discouraging testifying witnesses from committing perjury. *Id.* at ¶ 17; *People v. Lujan*, 2020 CO 26, ¶ 14. "A public trial also protects the public's and the press's qualified First Amendment rights to attend a criminal trial," thereby protecting the greater community's interest in monitoring the fair administration of the criminal justice system. *Jones*, ¶ 18. These essential functions are compromised when a court is closed to the public.

¶ 52 But the right to a public trial is not absolute. *Lujan*, ¶ 15. In some instances, competing interests may require closure of the courtroom. *See Jones*, ¶ 20 (sometimes the right to a public trial must yield to a higher interest, such as the protection of a defendant's right to a fair trial or the government's interest in protecting inappropriate disclosure of sensitive information). To accommodate this tension, the Supreme Court has articulated four

25

requirements, known as the *Waller* factors, that must be met to justify a courtroom closure:

> (1) "the party seeking to close the [proceeding] must advance an overriding interest that is likely to be prejudiced"; (2) "the closure must be no broader than necessary to protect that interest"; (3) "the trial court must consider reasonable alternatives to closing the proceeding"; and (4) the court "must make findings adequate to support the closure."

*Lujan*, ¶ 15 (quoting *Waller*, 467 U.S. at 48).

¶ 53    It is undisputed that there was not a complete closure of the courtroom.  But Quezada argues that the exclusion of the disruptive observer constituted a partial closure requiring reversal.

¶ 54    A partial closure may also violate a defendant's right to a public trial.  *Jones*, ¶ 27.  In some circumstances, the exclusion of a single person may constitute a partial closure.  *Id.* at ¶ 34.  But the Colorado Supreme Court has also recognized that sometimes a partial closure of the courtroom is so trivial that it does not violate a defendant's right to a public trial.  *Lujan*, ¶ 24 (under the trivial closure exception, no error occurs through a partial closure if the closure did not implicate the concerns animating the Sixth Amendment).

26

## D.    Analysis

¶ 55    Quezada contends that the exclusion of the disruptive observer resulted in a partial closure of the courtroom. Because the trial court did not expressly apply the *Waller* factors before excluding the observer, Quezada argues that reversal is mandated.

¶ 56    The People counter with multiple arguments. First, they contend that no closure occurred because the courtroom was never closed. Second, to the extent a partial closure occurred, the People contend it was trivial. Finally, even if a non-trivial partial closure occurred, the People contend that the trial court's factual findings — though they did not expressly reference *Waller* — were sufficient to satisfy the *Waller* criteria. We agree with the People's first and third arguments and therefore do not reach the second.

### 1.    No Closure Occurred

¶ 57    While it is undisputed that the trial court barred the disruptive observer from continuing to watch the proceedings via Webex, it is equally true that the courtroom itself remained open during the entirety of the trial. Quezada acknowledges this fact but argues that, once the court made the decision to permit some members of the public to attend the proceedings via Webex, it was

27

required to maintain the Webex connection for all persons observing via Webex unless it applied the *Waller* factors before excluding any attendee. In effect, Quezada contends that Webex observers are in the courtroom because its physical confines have been expanded by the use of remote viewing technology.

¶ 58 Quezada concedes that there is no constitutional right to attend a proceeding via Webex. But he analogizes the situation to one in which a state court, without a constitutional mandate, chooses to provide direct appeals. In such situations, though the direct appeal is not constitutionally mandated, once a state chooses to provide such a right, it must comply with constitutional guarantees in administering the appeal. *See Griffin v. United States*, 351 U.S. 12, 18 (1956) (if a state elects to provide appellate review, courts must assure equal protection and due process in the administration of those appeals). Having provided the option of attending a proceeding via Webex, Quezada argues, the court was required to apply the *Waller* factors before excluding a remote observer.

¶ 59 But Quezada's argument presupposes that the observer had no means of attending these proceedings other than via Webex.

28

The record does not support that conclusion. The doors to the courtroom remained open, and we reject the notion that Webex observers are somehow in the courtroom. Read in context, it is clear that the trial court excluded the observer from further Webex participation because they ignored or neglected to abide by the court's order to stay muted. The court began by noting that the observer had repeatedly failed to stay muted, as ordered by the court. And in excluding the observer, the court stated, "It is an order of the Court that you be expelled from these proceedings and that you not continue to observe these proceedings due to the disruption that your failure to mute your microphone has provided multiple times."

¶ 60    The court's order was clearly based on the observer's failure to mute their microphone while observing via Webex. Thus, the observer was precluded from further attendance via Webex. But the record contains no indication that the excluded observer was not permitted or able to travel to the courtroom to attend the trial in

person.[3]  Thus, the excluded observer was not precluded from attending the trial.  Stated otherwise, the remote observer could still have attended the trial in the same manner people have for centuries — by going to the courtroom.  Thus, there was no closure of the courtroom, partial or otherwise.

¶ 61     We note that, after the completion of briefing in this case, a division of this court addressed a somewhat analogous situation. *See People v. Bialas*, 2023 COA 50.  The trial in *Bialas* also occurred during the COVID-19 pandemic.  *Id.* at ¶ 3.  Initially, the physical courtroom was open to members of the public, but due to social distancing concerns, in-person seating was limited.  Some public observers were in the courtroom and seated close to one or more jurors.  *Id.*  Other members of the public were permitted to

---

[3] In reaching this conclusion, we acknowledge that the court also said, "I am expelling you at this time and, again, you are not to return to observe these proceedings because you apparently cannot follow the instructions of the Court not to be disruptive." Considered in isolation, this statement could be interpreted as a complete exclusion of the observer from the trial proceedings, whether via Webex or in person.  But we do not read a trial court order's statements in isolation; instead, we view them in their totality.  Read in context, it is clear the court excluded the observer from further Webex participation because of their repeated failure to stay muted.

watch a Webex live stream of the proceedings from a different courtroom. *Id.*

¶ 62 During the trial, one of the jurors reported to the judge that a member of the public in the courtroom was making remarks about the trial that the juror could hear. *Id.* at ¶ 4. In response, the trial court closed the courtroom to all members of the public, including the defendant's family. *Id.* at ¶ 5.

¶ 63 On appeal, a division of this court concluded that the broad exclusion of the entire public from the courtroom constituted a closure even though observers could view the proceedings via Webex from another courtroom. *Id.* at ¶ 15. In reaching this result, the division placed significant weight on the fact that the judge, lawyers, and others in the courtroom could not view the participants who were observing via Webex. This arrangement, the division concluded, deprived the court and participants of the ability to see the defendant's family, and thus compromised the important purpose that family members play in ensuring that the purposes of the Sixth Amendment are fulfilled.

> The exclusion of Bialas's family during her testimony likewise cuts against the assurance of a public trial. Even if Bialas's family could

31

> still view a livestream of the trial, the jury, the judge, and counsel were unable to see Bialas's family. Again, "the *presence* of interested spectators" is important to remind the triers of "the importance of their functions."

*Id.* at ¶ 13 (quoting *Jones*, ¶ 16).

¶ 64    *Bialas* is distinguishable from the situation here. No members of Quezada's family or the general public were excluded from the courtroom. Thus, there was no evidence that the judge, lawyers, and participants were deprived of the important reminder served by the presence of Quezada's family members. Moreover, in contrast to the broad exclusion order entered in *Bialas*, here, only one disruptive observer was precluded from viewing the trial via Webex.[4]

¶ 65    Quezada's reliance on *Vazquez Diaz v. Massachusetts*, 167 N.E.3d 822 (Mass. 2021), is misplaced. There, the court addressed whether a defendant who had waived his right to a speedy trial could insist upon having a suppression hearing in person rather than virtually. *Id.* at 827-28. In analyzing this issue, the court recognized the general propriety of proceeding virtually during the

---

[4] As previously mentioned, the record does not disclose the identity of the excluded observer. *See People v. Morgan,* 199 Colo. 237, 242-43, 606 P.2d 1296, 1300 (1980) (it is the appellant's duty to provide the court with record support for contentions raised on appeal).

pandemic and that such proceedings do not amount to a de facto violation of a defendant's right to a public trial. *Id.* at 839-40. But the court did not address the circumstances in which a disruptive participant may be excluded from virtual proceedings. Therefore, the case has limited relevance to the present dispute.

¶ 66    We also reject Quezada's argument that, if a court provides a means of virtual attendance at court proceedings while at the same time permitting in-person attendance, any exclusion of a disruptive virtual participant constitutes a partial or complete closure of the courtroom. Absent extraordinary circumstances not present here, if a courtroom remains open during the subject legal proceedings, the partial cessation of virtual proceedings does not amount to a closure of the courtroom for purposes of the constitutional right to a public trial.[5]

---

[5] We recognize that the General Assembly has recently enacted legislation requiring courts to make criminal proceedings available for remote public viewing and listening in real time. *See* § 13-1-132(3.5)(a), C.R.S. 2023. This legislation was passed after the trial in this case and is therefore not at issue on appeal. But we note that the legislation does not purport to preclude trial courts from exercising their discretion to exclude disruptive virtual participants. *See* § 13-1-132(3.5)(e)(IV) (trial courts shall take reasonable steps to ensure compliance with sequestration orders and ensure a fair trial, including terminating remote observation).

## 2. Adequacy of Trial Court's Factual Findings

¶ 67     Although there was no closure of the courtroom, even if we were to assume, for sake of argument, that a non-trivial partial closure did occur, we conclude that the trial court's factual findings were sufficient to satisfy the *Waller* factors.[6]

¶ 68     The parties agree, as do we, that the trial court articulated an overriding interest[7] that was likely to be prejudiced by the disruptive observer's continued participation via Webex.  The unmuted microphone allowed those present in the courtroom to

---

[6] The concurring opinion concludes that no courtroom closure occurs when a Webex observer is excluded from the live stream of the proceedings for being disruptive.  In doing so, our colleague addresses a multitude of potential scenarios that may arise in the future, and the difficulties they may pose for trial court judges who may also be tasked with making *Waller* findings in each such instance.  While we appreciate our colleague's practical concerns, we believe they are best assessed on a case-by-case basis, if and when they may arise.

[7] We note that, in the context of a partial closure, some courts have replaced the "overriding interest" component in factor one of the *Waller* analysis with the lower standard of a "substantial reason." *See People v. Jones*, 2020 CO 45, ¶ 24 (collecting cases).  The Colorado Supreme Court has not yet addressed that issue.  *See id.* at ¶ 27 ("[W]e save for another day the decision regarding whether the first *Waller* factor requires a 'substantial reason' or an 'overriding interest' in this context.").  We need not resolve the debate because we conclude the trial court's findings satisfy the more rigorous standard.

34

hear the statements being made by the observer and those around them. These repeated disruptions compromised the orderly presentation of the evidence and posed the risk of contaminating the jury with prejudicial information. The avoidance of such occurrences was necessary to protect the parties' overriding interests in a fair trial.

¶ 69     The parties also agree, and so do we, that the second *Waller* factor was met because the court's remedy was narrowly tailored to exclude only the repeat violator.

¶ 70     The parties part company with respect to the third and fourth factors. Quezada contends the court did not consider a less drastic alternative to excluding the offending observer. Quezada argues that the court could have muted all remote observers, rather than excluding the disruptive observer completely. But, as the People note, this was not a viable alternative because the interpreters, who were attending the proceedings virtually, needed to be able to inform the court in real time when they were not able to hear the audio feed well enough to effectively interpret the proceedings. Similarly, if the attendees' microphones were always locked on mute, other observers could not inform the court if they were

unable to hear the proceedings. Additionally, the court did not exclude the observer on the first offense, but only after repeated violations of the court's order. Under these circumstances, we conclude there was not a reasonable alternative to excluding the observer from the virtual proceedings.

¶ 71 We also reject Quezada's contention that the trial court made inadequate factual findings to support excluding the observer. Although the court did not expressly reference *Waller*, it made substantial factual findings explaining the observer's repeated violations of the court's order and the rationale behind its decision to exclude them from the proceedings. We do not reverse a trial court's closure order simply because it fails to include an incantational reference to *Waller*. *People v. Turner*, 2022 CO 50, ¶ 35. Rather, our focus is on whether the trial court's factual findings support the closure, given the considerations articulated in *Waller* and its progeny. *Id.* at ¶¶ 35-36. For the reasons previously articulated, we conclude that the trial court's exclusion of the disruptive observer served that purpose.

¶ 72 Finally, we reject Quezada's assertion that the initial exclusion order violated his right to a public trial because the trial court failed

36

to make a contemporaneous record of its decision or the reasons therefor.

¶ 73    The advent of virtual proceedings during the pandemic placed extraordinary demands on trial courts.  Not only were they required to continue to manage the complexities of a typical criminal trial — which include listening to the evidence, ruling on objections, monitoring the courtroom activities, ensuring jurors only receive admitted evidence, and a myriad of other tasks.  But with the advent of remote proceedings, trial court judges were also required to enable and monitor the attendance and online behavior of virtual attendees.  Often these substantial tasks were complicated by the limited capacity of new technology and the inherent vagaries of internet connectivity.  Given these dynamics, we respectfully disagree with Quezada's suggestion that it is a minor inconvenience to require the trial court judge to make a contemporaneous record of the *Waller* factors every time a disruptive observer is excluded from the proceedings or the virtual proceedings are interrupted.

¶ 74    While contemporaneous findings for such events are ideal, that does not foreclose the possibility that a trial court can make an appropriate record of its actions later.  Here, the trial court

37

explained that it had previously excluded the offending observer because they disregarded the court's order and had interfered with the orderly presentation of the evidence.  Moreover, this disclosure did not generate any objection from Quezada's counsel.  Thus, the delay in making the record was of no consequence in this case.

¶ 75    For these reasons, we conclude that the trial court did not violate Quezada's right to a public trial.

## V.    Disposition

¶ 76    The judgment is affirmed.

JUDGE J. JONES concurs.

JUDGE JOHNSON specially concurs.

JUDGE JOHNSON, specially concurring.

¶ 77    I agree with the majority opinion in its overall disposition.  But I write separately to address some of the majority's analysis concerning the courtroom closure in Part IV.  I agree that the facts — a disruptive observer on Webex was expelled from the electronic platform when the person continued to violate the court's directive that all participants must remain muted — do not constitute a courtroom closure.  *Supra* ¶ __.

¶ 78    But I do not agree with the path the majority took to arrive at its conclusion.  It reasoned that there was no courtroom closure because the disruptive Webex observer theoretically could have attended in-person proceedings, as the courthouse and the physical courtroom remained open to the public.  *Supra* ¶ __.  The majority uses a "belt and suspenders" approach to conclude there was no closure of the courtroom, but even if there was, it satisfied the factors under *Waller v. Georgia,* 467 U.S. 39 (1984).  But the majority's analysis tries to put a square peg into a round hole.  What do I mean by this?  Two things.

¶ 79    First, there should be a difference between a courtroom closure that possibly violates a defendant's constitutional right to a

public trial, thus triggering an analysis under *Waller*, and a trial judge's exercise of discretion to exclude a disruptive individual from the courtroom (or Webex), which should not. Instead, when a judge removes a disruptive individual from the proceedings, this simply is part of the court's authority to maintain an orderly administration of justice, as the judge deems appropriate and necessary.

¶ 80    I know that our supreme court appears to have rejected this viewpoint in *People v. Turner*, 2022 CO 50, ¶¶ 23-24. There, the court said that "the exclusion of even a single individual from the courtroom, regardless of the reason for the exclusion, constitutes a partial closure that implicates the Sixth Amendment and the *Waller* test." *Id.* at ¶ 23. *Turner* reasoned that exempting exclusion of individuals "for cause" — ostensibly including a disruptive individual — would be problematic because it "would leave trial courts guessing where cause ends and the public trial right begins." *Id.*

¶ 81    But I fall into the non-majority camp — described by Chief Justice Boatright in his concurrence in *Turner* — that not every exclusion of an individual from the courtroom requires *Waller* findings. He said that, when removing a disruptive individual from

40

the courtroom, "judges in th[o]se instances are merely exercising their discretion to ensure the safety, fairness, and efficiency of the trial." *Id.* at ¶ 49 (Boatright, C.J., concurring in the judgment); *see also People v. Jones*, 2020 CO 45, ¶ 104 (Boatright, J., dissenting) (because the individual who was removed from the courtroom was disruptive, that type of exclusion should be reviewed for an abuse of discretion).

¶ 82     This majority recognizes that "[t]he advent of virtual proceedings during the pandemic placed extraordinary demands on trial courts," so much so that it also recognizes that it is not "a minor inconvenience to require the trial court judge to make a contemporaneous record of the *Waller* factors every time a disruptive observer is excluded from the proceedings or the virtual proceedings are interrupted." *Supra* ¶ __. Therefore, when a Webex observer is being disruptive by remaining unmuted, the person's removal should be no different than if the individual were physically in the courtroom gallery and refusing to comply with the judge's orders because he continues to listen to music, talk on his phone, or speak loudly to other spectators.

41

¶ 83     I sat on the division for *People v. Bialas*, 2023 COA 50. My

position in that case is not at all inconsistent with this one. The

majority says that the "division placed significant weight" on the

fact that, even though family and friends could view the proceedings

in a different room with a live stream broadcast, the court's ouster

of individuals from the courtroom was a closure. *Supra* ¶ __.

Regardless of the live streaming aspect present in *Bialas*, the

closure in that case was overly broad, included the defendant's

family (who the record showed were not part of the comments or

actions giving rise to the closure), and lacked court findings to

determine whether a more narrowly tailored approach could have

addressed the situation. *Bialas*, ¶¶ 19, 22, 26.

¶ 84     I acknowledge that the court in this case did not make

findings when it first excluded the observer from Webex (i.e.,

findings as to how the person was disruptive and why the court

took the action, not *Waller* findings). As a result, the court's first

unannounced exclusion of the observer on Webex — who joined a

second time and then continued to remain unmuted — is

concerning. But the court's later remarks revealing that the same

observer continued to misbehave are, in my view, sufficient to

42

conclude that in this instance, the court did not abuse its discretion.

¶ 85 Second, because of *Turner*, the majority walks a fine line, coming close but not crossing it, by definitively concluding that Webex is not an extension of the "courtroom," thus implicating the same concerns and considerations addressed in *Waller*. If trial judges are required to make *Waller* findings every time the court expels a disruptive individual from a remote platform, I predict the courts will see a significant uptick in public closure cases. And this is not just because of the majority's analysis. As the majority points out, the General Assembly recently passed section 13-1-132, C.R.S. 2023, which mandates remote public viewing of criminal proceedings in real time. *Supra* ¶ __ n.4.

¶ 86 That legislation gives discretion to judges to suspend or modify the remote viewing based on various authorized reasons, such as the court's lack of technology or funds to obtain the necessary equipment, safety concerns and risks to parties or others, or to protect confidential information and sequestration orders. *See* § 13-1-132(3.5)(a)(I), (3.5)(a)(IV)(A), (3.5)(d). And the General Assembly authorizes judges to exercise discretion by ensuring that

their actions to suspend or modify remote proceedings employ the "less restrictive alternative." § 13-1-132(3.5)(a)(IV)(B). The statute defines that phrase as "allowing remote audio-only observation while disabling video observation or turning off remote observation for particular witnesses or discrete portions of the proceeding." *Id.* Ostensibly a court will make findings to comply with these statutory bases to suspend or modify remote viewing.

¶ 87 Because the General Assembly has indicated its preference for live streaming court proceedings, when is the Webex (or other technology) a courtroom and when is it not? This seems to create just as much murky water that *Turner* was supposedly trying to avoid because it was not clear where the disruptive individual being removed for cause ends and the right to a public trial begins.

¶ 88 But consider the questions raised by this scenario: there is a high-profile case and many people — interested public, family and friends, the press — want to view the proceedings. The judge will now need to monitor every person who has joined the Webex and stop proceedings to make findings under *Waller* before the court has authority to eject a person from the remote platform? What if the person is writing remarks for everyone to read in the chat

44

feature, possibly unseemly ones or ones that specifically target certain people or comment on the evidence being presented?  Or the person has the video feature on and is making rude and inappropriate gestures while onscreen?  Or the person is wearing clothing that is inappropriate, because the outfit makes a statement about the case or overly reveals certain physical attributes?

¶ 89     True, people in the courtroom — significantly the jurors or witnesses, given their functions in the case — likely will not see the antics of the online observers.  But all the other viewers on the Webex may see these activities.  Because technology now makes it possible for all criminal proceedings to be observed by anyone — even people from out of state or another country — I pose this question: Is remote viewing really going to be considered an extension of the courtroom that, under current supreme court precedent, is likely to trigger courtroom closure considerations under *Waller*?

¶ 90     For instance, under the majority's reasoning, the person expelled in this case might very well have been out of state, and the individual could not just hop in a car to be "present" in the physical courtroom; it might have been a theoretical possibility but not a

45

practical reality. We are treading on shaky ground if, first, we consider remote proceedings to be an extension of the physical courtroom in all cases[1] and, second, the court cannot simply, in the exercise of its discretion, expel individuals from the remote platform who act inconsistently with or disrupt the orderly administration of justice.

---

[1] Even if technology improves over time, thus eliminating or decreasing some of my concerns, the court must retain its traditional authority to manage decorum in the courtroom — which seems to, at times, and increasingly so, include the electronic platform and the people on that platform — with greater flexibility than what is required under *Waller v. Georgia*, 467 U.S. 39 (1984), and its progeny.